**UNITED STATES of America,**
Plaintiff,

v.

**E. I. DU PONT DE NEMOURS AND COMPANY**, General Motors Corporation, Christiana Securities Company, and Delaware Realty & Investment Corporation, Defendants.

**Civ. A. No. 49 C–1071.**

United States District Court
N. D. Illinois, E. D.

Oct. 2, 1959.

See also 167 F.Supp. 957.

2

George D. Reycraft, Eugene Metzger, Bill G. Andrews, Edmund D. Ludlow, and Paul A. Owens, Antitrust Division, Washington, D. C., for the Government.

Sidley, Austin, Burgess & Smith, by George Ragland, Jr., Chicago, Ill., and Covington & Burling, by Hugh B. Cox, John Lord O'Brian, Charles A. Horsky, Daniel M. Gribbon, and Alvin Friedman, Washington, D. C., for defendant, E. I. du Pont de Nemours and Co.

Charles A. Rittenhouse III, and Irving S. Shapiro, Wilmington, Del., for Legal Department, E. I. du Pont de Nemours and Co.

Mayer, Friedlich, Spiess, Tierney, Brown & Platt, by Leo F. Tierney, Bryson P. Burnham, and Lee N. Abrams, Chicago, Ill., and Henry M. Hogan and Robert A. Nitschke, Detroit, Mich., for defendant, General Motors Corp.

Kirkland, Ellis, Hodson, Chaffetz & Masters, by Howard Ellis and Don H. Reuben, Chicago, Ill., Dewey, Ballantine, Bushby, Palmer & Wood, by Wilkie Bushby, Philip C. Scott, and Aram J. Kevorkian, New York City, for defendant, Christiana Securities Co. and Delaware Realty & Investment Corp.

Andrew J. Dallstream, Milton H. Cohen, and Burton R. Rissman, Chicago, Ill., amicus curiæ with respect to interest of Stockholders of E. I. du Pont de Nemours and Co.

Manuel E. Cowen and Francis M. Clamitz, Associate Counsel, Chicago, Ill.,

amicus curiæ with respect to interest of Stockholders of General Motors Corp.

LA BUY, District Judge.

On June 3, 1957, the Supreme Court of the United States held that the acquisition by E. I. du Pont de Nemours & Company of approximately 63,000,000 shares of common stock of General Motors Corporation violated Section 7 of the Clayton Act, 15 U.S.C.A. § 18. It remanded the case to this Court "for a determination, after further hearing, of the equitable relief necessary and appropriate in the public interest to eliminate the effects of the acquisition offensive to the statute." (353 U.S. 586, 607, 77 S.Ct. 872, 885, 1 L.Ed.2d 1057) The decision of the Supreme Court reversed the prior determination of this Court, D.C., 126 F. Supp. 235, that the acquisition of stock of General Motors by du Pont did not violate Section 7 of the Clayton Act but did not review or reverse the findings of this Court that there had been no violation by any of the defendants of Sections 1 or 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2.

The defendants now before the Court, in addition to du Pont, include General Motors Corporation, Christiana Securities Company which owns 12,199,200 shares of du Pont common stock, and Delaware Realty and Investment Company which owns 1,217,920 shares of du Pont common stock and 49,000 shares of common stock of Christiana. Christiana and Delaware's motion for dismissal of the appeal as to them was denied by the Supreme Court, with the direction that they be retained as parties "pending determination by the District Court of the relief to be granted." 353 U.S. 586, 608, 77 S.Ct. 872, 885, 1 L.Ed.2d 1057.

The Court appointed Andrew J. Dallstream amicus curiae to represent the interests of the stockholders of du Pont, and Manuel E. Cowen amicus curiae to represent the interests of the stockholders of General Motors. Both are among the leading members of the Illinois bar. Mr. Dallstream is a past president of the Chicago Bar Association and a lawyer with vast experience in the field of corporate law and finance. Mr. Cowen is a Master of the United States District Court of the Northern District of Illinois, Eastern Division, and has had wide experience in corporate law. The order appointing the amici curiae provides that they study the various plans proposed by the litigants and conduct the necessary investigation in order to present plans and make recommendations to the Court.

On September 25, 1957 the Court held a pre-trial conference to determine the mode of procedure following the mandate of the Supreme Court. On October 25, 1957 the Government submitted its proposed final judgment. On May 14, 1958 du Pont filed its proposed final judgment. In June 1958 General Motors filed its objections to the final judgment proposed by the Government, but did not offer a form of decree. In August 1958 each of the amici curiae submitted proposed final judgments and detailed comments on the plans submitted. Prior to the trial which commenced on February 16, 1959, the parties took numerous depositions and submitted interrogatories.

Christiana and Delaware filed a motion to strike certain provisions affecting them from the final judgment proposed by the Government. The motion was argued orally before trial, briefs were filed, and the matter taken under advisement.

The Government's proposed judgment provides, in substance (a) that du Pont, Christiana and Delaware deliver to a trustee to be appointed by the Court certificates representing the shares of General Motors stock held by them; (b) that the trustee deliver to each du Pont stockholder of record, other than Christiana and Delaware (Christiana owns 535,000 shares of General Motors and Delaware owns none) [1], notices of meetings of

---

1. There were no allegations in the complaint and no finding by the Supreme Court regarding these shares of stock of General Motors owned by Christiana.

stockholders of General Motors and proxies authorizing such stockholders to vote the shares of General Motors stock held by the trustee pro rata according to their holdings of the shares of du Pont stock, including the stock to be deposited by Christiana and Delaware; (c) that du Pont declare annually for ten years a dividend of one-tenth of the shares of General Motors stock held by it, or 6,300,000 shares per annum (there are about 1.38 shares of General Motors common stock allocable to each share of du Pont); (d) that the trustee sell the General Motors shares comprised in such dividends allocable to Christiana and Delaware and to persons who are stockholders of Delaware (approximately 2,000,000 shares per annum), within twelve months after receipt; (e) that du Pont, Christiana and Delaware be enjoined from acquiring any General Motors stock or exercising any control or influence over General Motors; (f) that du Pont and General Motors be ordered to terminate any agreement between them which provides (1) that General Motors purchase any specified percentage of its requirements of any product of du Pont, (2) that either grant to the other any exclusive patent rights, and (3) that General Motors grant to du Pont a first or preferential right to manufacture or sell any chemical discovery made by General Motors; (g) that General Motors and du Pont be enjoined from having any joint enterprise; and (h) that General Motors on the one hand, and du Pont, Christiana and Delaware on the other, be enjoined from having any common officer or director.

The Government proposal also provides that stockholders of du Pont (other than Christiana and Delaware, and persons who are stockholders of Delaware), will have the option to fill out any fractions of shares received as dividends into full shares by purchasing fractions out of the shares owned by Christiana, Delaware and persons who are stockholders of Delaware held by the trustee and, further, that the stockholders of du Pont (other than Christiana, Delaware and persons who are stockholders of Delaware) are to be given fifteen-day options to purchase the shares owned by Christiana, Delaware and the stockholders of Delaware required to be sold annually by the trustee, all at an unspecified price or prices. Also, the trustee is given the right to apply to the Court to postpone any annual sale if, in his judgment, reasonable market conditions did not prevail, provided that such sales did take place before the end of the ten-year period. The proposed judgment further provides that reasonable market conditions shall not be deemed to exist if the price which can be realized at the time by the trustee is not sufficiently high to reflect the fair value and true worth of the stock. The proposed decree also provides that the trustee may, in his own discretion, sell in any one year more shares of stock than the shares received by Christiana, Delaware and persons who are stockholders of Delaware as a dividend for that year from du Pont.

The Commissioner of Internal Revenue ruled that under the Government's proposed judgment the annual dividends payable by du Pont in shares of General Motors stock would be taxable as ordinary income to the extent of du Pont's current earnings and accumulated earnings and profits. In the case of individual stockholders the Commissioner ruled that the amount of the dividend would be the fair market value (at the time of the hearing it ranged from $46 to $48 per share, and is now around $55 per share) [2] of the General Motors shares at the time of each annual distribution. In the case of tax paying corporate shareholders the amount of the dividend would be the lesser of the fair market value of the shares or du Pont's tax basis which is approximately $2.09 per share of General Motors. Such corporate shareholders would be taxed at

2. Thus, individuals would be taxed at rates from 20% to 91%, less dividend received credit, on the value of the shares received.

the regular corporate rate after allowance of the dividends received deduction which would result in an effective rate of approximately 7.8% on the amount of the dividend received. The Commissioner of Internal Revenue also ruled that gain on the sales of General Motors stock required under the Government's proposed judgment would be taxable to Christiana, Delaware and the stockholders of Delaware at the capital gains rate of 25%.

The position of du Pont is that the proposed Government decree would bring about disastrous tax consequences to stockholders of du Pont, and that the sales of General Motors stock by the trustee, the additional sales by du Pont stockholders which will be made to raise money with which to pay taxes, and the sales by existing holders of General Motors stock, would drastically reduce the market price of General Motors stock and cause disastrous losses to thousands of people who were innocent of any illegal act, that there would be also a drastic reduction in the market value of shares of du Pont stock, that there would be an adverse effect on General Motors itself and, possibly, an adverse effect on the whole stock market and the economy. Du Pont further took the position that it was unnecessary to require the divestiture of the legal title as proposed by the Government and that it was sufficient to divest du Pont of the votes on the General Motors shares owned by it and to "pass through" such votes to the ultimate stockholders of du Pont, Christiana and Delaware.

The decree proposed by du Pont provides for such a "pass through" of the vote. It also enjoins du Pont from acquiring any General Motors stock, except such stock as might be distributed in respect of the General Motors stock held by it or as might be acquired by the exercise of rights. It also enjoins du Pont from having as a director, officer or employee any person who is at the same time an officer or employee of General Motors, and provided that no person who is a director, officer or employee of du Pont may serve as a director of General Motors without the approval of the Court.

Christiana and Delaware filed comments on the Government proposal, taking substantially the same position as du Pont, but also taking the position that the Court was without power to grant relief against them, because no violation of the statute had been alleged in the complaint or found against them. Christiana and Delaware, however, consented to the decree proposed by du Pont so far as it required them to "pass through" to their stockholders the votes on the General Motors stock received from du Pont or, in the case of Delaware, from Christiana.

General Motors filed its objections to the final judgment proposed by the Government. It also urged that it was not a party subject to the order of the Court and could not be ordered to do even the ministerial things proposed in the Government's decree.

The amici curiae filed separate comments which criticized certain features of the Government proposal and the du Pont proposal. The plans of the amici contained provisions for "passing through" the vote on the General Motors shares held by du Pont to the ultimate stockholders of du Pont, Christiana and Delaware. They also provided for an injunction against du Pont, Christiana and Delaware on the one hand, and General Motors on the other, having any common director, officer or employee.

The plans filed by both amici provided that no one who was an officer or director of du Pont, Christiana or Delaware, or spouse, or person living in his household, should exercise any "passed through" voting rights.

The plan filed by amicus Dallstream extended this prohibition to anyone employed by du Pont in selling automotive finishes or fabrics to General Motors. The plan filed by amicus Cowen extended the prohibition to any person who

for a period of ten years prior to the decree had been an officer or director of du Pont, Christiana or Delaware. The plan filed by amicus Dallstream had an additional provision, similar to the injunction proposed in the Government plan regarding trade relations between du Pont and General Motors.

Both plans of the amici referred to possible federal legislation granting relief from income tax on the shares of General Motors distributed as a dividend pursuant to Court order and providing for application to the Court in such event for an amended plan. A bill providing for tax relief was introduced in Congress in 1958 and has been reintroduced during the current session, S. 200. The bill relieves from income tax any distributions made pursuant to a court order in an antitrust case. It is similar in theory to legislation which gave tax relief in the case of dispositions ordered by the Securities and Exchange Commission pursuant to the Public Utility Holding Company Act, 15 U.S.C.A. § 79 et seq., and in the case of dispositions ordered by the Board of Governors of the Federal Reserve System pursuant to the Bank Holding Company Act, 12 U.S.C.A. § 1841 et seq. While S. 200 provided for relief from the income tax on dividends, it would not grant relief from the capital gains tax on sales made pursuant to Court order. Other bills giving somewhat different forms of tax relief in antitrust cases were introduced in both houses of Congress before the first session of the 86th Congress closed, but no law was passed at the session.

The Dallstream proposal contains a program which has been termed in this proceeding a "takedown." In brief, under the takedown program du Pont would create a new class of common stock known as "du Pont Special Common" which would have no rights in the General Motors stock or its proceeds held by du Pont. The stockholders would be permitted to apply to the court from time to time for permission to exchange their present du Pont Common for a like number of shares of du Pont Special Common plus their allocable portion of General Motors shares owned by du Pont. Pursuant to order of the court the parties requested the Internal Revenue Service to issue a ruling as to the tax consequences of the provision for takedown. It was orginally assumed by amicus Dallstream that the takedown plan would have essentially the same income tax consequences as a distribution made in accordance with the Government's proposal. However, the Internal Revenue Service has ruled otherwise in some respects. The particular merit of the takedown plan is that each du Pont shareholder could select the time at which to apply to the court for approval of an application to take down his allocable General Motors shares. Thus, each shareholder would have an opportunity over a period of years to select a time at which the takedown might be accomplished with the least unfavorable tax consequences. The ruling as issued by the Internal Revenue Service would permit the timing advantage as described above. The ruling as issued would, however, deny to corporate stockholders the 85% deduction for dividends received, and to other stockholders the $50 exclusion and 4% credit against tax for dividends received, with respect to the receipt of General Motors shares taken down.

Amicus Dallstream is filing with the Internal Revenue Service and the Treasury Department a request that the income tax regulations be amended to specifically provide that such intercorporate deduction be applicable to corporations, and that such $50 dividend exclusion and dividend credit be applicable to other taxpayers, who are allowed to take down, on the ground that such regulations as now construed violate the express provisions of the statute. It is urged by amicus Dallstream that the ruling as respects denial of the dividend relief provisions expresses an opinion in direct opposition to the established cases. Whether the regulations are so changed

or not, or the ruling of the Department is ultimately sustained or overruled nevertheless the takedown provision has further obvious advantages under the ruling now handed down which are not available if the Government plan were to be adopted.

First, any present or future purchaser of du Pont stock can exercise the takedown provision, if approved by the court, paying a tax on only the lesser of (a) the fair market value of the General Motors shares taken down, or (b) the excess of the sum of the fair market values at time of takedown of the General Motors shares and of the new du Pont Special Common received over his tax basis for the old du Pont Common surrendered. Recent purchasers of du Pont Common Stock who have a high cost could take down with very little tax cost by reason of that limitation.

Second, new purchasers of present du Pont stock exercising the right of takedown prior to any increase in market value would be able to take down the stock without tax consequences. For this reason, it can reasonably be expected that, in addition to the normal market, security dealers would engage in arbitrage transactions in du Pont and General Motors stock, which would create additional buying demand and would stimulate utilization of the takedown program.

Third, in the case of individual stockholders who die, assuming takedown was exercised by their estates shortly after death, the takedown would be without any or only nominal tax consequences; so that in the course of one generation most of the stock held by individuals might be expected to be exchanged under the takedown program.

Fourth, the so-called built-in tax liability to purchasers in the event of the adoption of the Government plan described by many experts as likely to have depressing market consequences upon du Pont, would under the takedown plan, be limited solely to a tax on appreciation in value after the date of purchase.

The Government filed a memorandum replying to the criticisms made of its proposed judgment by the other parties and by the amici.[3] The memorandum of the Government offered no change in its proposed judgment but it did make certain suggestions as to how its proposed judgment might be modified. These suggestions included (a) an expansion of the period required for execution of the plan from 10 years to 20 years, (b) the distribution by du Pont of the General Motors stock in lieu of all or part of its regular cash dividend, and (c) the distribution by du Pont in one dividend of all the General Motors shares held by it. It appeared, however, that the Government's discussion of these suggestions was not intended to indicate that the Government was prepared to modify its plan in accordance with the suggestions or would consent to any such modification. At a later point in the hearing the chief counsel for the Government stated that he had no authority to propose or to consent to any change in the Government's proposed judgment.

■ Questions have been raised with respect to the power of this Court to grant relief against General Motors, Christiana, Delaware and the stockholders of Delaware, which should be considered at the threshold of this opinion.

General Motors contends that, since the Supreme Court has not found that it has violated Section 7 of the Clayton Act

3. Along with its memorandum the Government filed a study by Alfred Boni, President of Boni, Watkins, Jason & Co., economic and management consultants of New York City, regarding the effect on the market prices of General Motors stock and du Pont stock if the Government proposed decree were put into effect. This study was not offered or received in evidence. Mr. Boni testified in the hearings, and portions of the study were put in evidence as exhibits through him.

or any other provision of the antitrust laws, this Court is without power to grant any relief against it and argues that if the Court should grant relief it would violate fundamental constitutional principles of due process. The authorities cited by General Motors do not sustain this broad proposition. The fact that General Motors has not violated Section 7 of the Clayton Act is a relevant consideration in determining the nature of the relief that might be granted against General Motors but that fact does not lead to the conclusion that this Court is powerless to grant any relief against General Motors. The authority of the Court in this case is derived from Section 15 of the Clayton Act, 15 U.S. C.A. § 25, which clothes the Court with all the historical powers of a court of equity. The Supreme Court has held that in framing equitable decrees under the antitrust laws District Courts are given "large discretion to model their judgments to fit the exigencies of the particular case." [353 U.S. 586, 77 S.Ct. 885.] The Court is of the opinion that in a proceeding under Section 7 of the Clayton Act in which it has been found that the acquisition of stock by one corporation in another violates the statute, a court of equity has power to grant such relief against the corporation whose stock has been acquired as may be necessary and appropriate in the public interest to eliminate the effects of the acquisition which have been held to be offensive to the statute. For this reason the Court concludes that the Court has the power to grant the kind of relief against General Motors which is provided for in later passages of this opinion. In the hearing on relief General Motors participated fully, cross-examining witnesses presented by other parties and presenting witnesses of its own, so that its procedural rights have been fully protected.

The contentions made by Christiana and Delaware raise a somewhat different problem. In support of their motion to strike the portions of the Government's proposed judgment which request relief as against them these corporations argue that the granting of relief against a party must be based upon a cause of action justifying relief, that no cause of action under the Clayton Act has been asserted against Christiana and Delaware and that the relief proposed against them cannot be granted on the basis of the Government's cause of action against du Pont. The Government on the other hand, relies on the proposition that relief may be had against any party to an antitrust action where dissipation of the effects of violation of the antitrust laws requires such relief.[4] The Government also relies upon the Supreme Court's action in denying the motion of Christiana and Delaware to dismiss the appeal and retaining them as parties pending a determination of the relief that should be granted. A review of the authorities cited in support of these opposing legal contentions indicates that none of them deals with a situation that is comparable to the one now before the Court.

As in the case of General Motors, the answer to this question may be found in the broad discretion which is conferred upon the Court by Section 15 of the Clayton Act. Christiana and Delaware are parties and the Supreme Court has held that they are properly before the Court. It cannot be disputed that under Section 15 this Court possesses the authority to enter an order with respect to General Motors stock now owned by du Pont as may be appropriate and necessary to remedy the violation of the statute which the Supreme Court has found to exist. In the exercise of its authority the Court could enter a judgment which directly and substantially affects the

---

4. The Government also argued that in fact relief against Christiana and Delaware is necessary in this case because of the stock relationship existing between the two companies and the du Pont Company. In this connection it also adverts to the finding made by this Court in its opinion after the trial in chief that the du Pont family "controls" the management of the du Pont Company.

rights and interests of Christiana and Delaware even though they have not been found guilty of violating any law. It follows, in my opinion, that this Court may grant certain kinds of ancillary relief against these two corporations, not because they have violated the statute but because the granting of the relief is an appropriate and necessary exercise of the power of this Court to frame a judgment which will effectively dissipate the consequences of the stock acquisition found to be unlawful. This is particularly true in the instant case where the absence of power to grant any kind of relief against Christiana and Delaware might leave the Court in a position where to discharge its duty it would be necessary to frame a decree which would entail harsh consequences to a large number of innocent parties and would therefore to that degree be against the public interest and also offensive to justice.

The fact that the two corporations have not violated Section 7 should be taken into consideration in determining the nature and extent of relief that may be granted against them. Doubtless there are forms of relief which this Court should not, or perhaps could not, grant against Christiana and Delaware in view of the fact that they have not been found to have violated the antitrust laws. But this does not justify the broad conclusion that the Court has no power whatever to grant any relief that might affect the interests of the two corporations. The Court therefore concludes that it has power to grant the relief against Christiana and Delaware provided for later in this opinion.

The stockholders of Delaware who are also stockholders of du Pont are in a different position from either General Motors or Christiana and Delaware. They are not parties and are not before the Court. Some of these stockholders were originally named as defendants but were dismissed during the course of the trial in chief, in some instances with the consent of the Government. The Government did not appeal from the dismissals that were made without its consent. At no time during the course of the hearing on relief did the Government attempt to bring these shareholders before the Court either by resort to the procedures available to it under Rule 23 of the Rules of Civil Procedure, 28 U.S.C.A. or by other method, although the Government was on notice that the defendants contended that if any relief were to be granted against these shareholders they were indispensable parties and as such were entitled to notice and representation.

None of the parties before the Court has authority to speak for these stockholders. In view of the nature of the relief requested against these stockholders by the Government neither du Pont nor Delaware can be regarded as a representative of this particular group of stockholders. The Government seeks relief that touches the individual interests of these stockholders and not relief concerned with matters that are corporate in their character and it is only as to corporate matters that a corporation is normally regarded as representative of its shareholders. Furthermore, the relief requested by the Government would discriminate between this particular group of stockholders and other stockholders of both du Pont and Delaware. There is therefore a potential conflict of interest between this particular group of stockholders and the other stockholders of Delaware and du Pont which disqualifies the corporations as representatives of this particular group of stockholders. Baltimore, C. & A. R. Co. v. Godeffroy, 4 Cir., 1910, 182 F. 525 and cases cited therein. In these circumstances the Court holds that the stockholders of Delaware who are also stockholders of du Pont would be indispensable parties if the relief sought by the Government were to be granted directly against them and that since they are not parties that relief cannot be granted.

Under the mandate of the Supreme Court it is the responsibility of this Court to frame a judgment which will

eliminate the effects of du Pont's acquisition of stock of General Motors which are offensive to the statute. The effect of the acquisition which the Supreme Court found to be offensive to the statute was the "reasonable probability" that the acquisition might result in restraint or monopolization of the market for automotive fabrics and finishes. 353 U.S. 586, 595, 607, 77 S.Ct. 872, 1 L.Ed.2d 1057. Accordingly, the problem before this Court is one of devising a judgment that will effectively guard against the probability of restraint or monopolization which the Supreme Court found to exist.

■■ The primary duty of the Court is therefore clear. But in the performance of this duty, particularly as it may involve a choice among different remedial measures that will be equally effective to achieve the statutory purposes, there are certain other considerations that should not be ignored. The property interests involved are immense. The 63,000,000 shares of General Motors owned by du Pont have a current market value of over $3,500,000,000. Any judgment that this Court may enter with respect to this stock will affect the interests of hundreds of thousands of persons in addition to the interests of the four corporations who are before the Court as parties. The record shows that at the time of the hearing there were over 230,000 individuals who were either direct or benefiical owners of du Pont stock. General Motors has more than 700,000 stockholders of record. Christiana has approximately 4,000 stockholders. Substantial amounts of the stock of all three of the corporations are owned by educational, religious and charitable organizations. In framing a judgment the Court should take into account the interests of all of these stockholders.

The effect that a judgment in this case may have upon the lawful interests of the corporate defendants in their separate corporate capacities is of course a matter which the Court should consider in framing a judgment, but in the circumstances of this case it appears to the Court far less important than the interests of the many thousands of stockholders whose rights are directly involved. Under no theory can these stockholders be said to have participated in any violation or engaged in any improper conduct. Moreover, the Government itself cannot escape responsibility for the plight of these stockholders. At the time of the acquisition there existed a very small fraction of the present number of stockholders of the corporations involved. It waited some thirty years after the acquisition occurred before bringing this action. It should, therefore, recognize that stockholders who purchased du Pont in those intervening years had every reason to believe that du Pont's holding of General Motors was entirely proper and legal.

It was with these considerations in mind at the beginning of the hearing on February 16, 1959, this Court stated:

"The primary problems to be resolved through this trial is for the Court to promulgate a decree which will remedy the violation of Section 7 of the Clayton Act, without penalizing those who may become the innocent victims of this case, the stockholders and the beneficiaries in various trusts and institutions.

"Equity and justice demand that the decree protect the interests of this group lest they become the casualties of this litigation, for under no reasonable theory can they be accused of violating any provision of the antitrust laws.

"To redress a violation of law in this case is fairly simple, but to do it without punishing innocent people is the big problem here. During the delay of over thirty years before filing this lawsuit, the rights of over a million stockholders of these corporations have intervened, which greatly aggravates the Court's problem."

This does not mean that the private interests of the stockholders can out-

weigh the public interest in a judgment that will effectively dissipate the effects of the acquisition found to be unlawful. But it does mean that in the opinion of this Court the primary public purpose should be achieved so far as possible without inflicting unnecessary injury upon innocent stockholders in the various corporations involved. The purpose of the judgment should be remedial and not punitive. Hartford-Empire Co. v. United States, 323 U.S. 386, 409, 65 S.Ct. 373, 89 L.Ed. 322; United States v. National Lead Co., 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077. No harsh and oppressive consequences should be visited upon the stockholders unless it can be shown on the facts that these results are inescapable if a decree is to be framed that will comply with the mandate of the Supreme Court. The cases leave no doubt that these are considerations which the Court should weigh in the framing of its final judgment. United States v. American Tobacco Co., 221 U.S. 106, 185, 31 S.Ct. 632, 55 L.Ed. 663. Compare Timken Roller Bearing Co. v. United States, 341 U.S. 593, 604, 71 S.Ct. 971, 95 L.Ed. 1199.

■ The defendants have suggested that in framing the judgment the Court should properly take into account that the question whether there was a violation of law was reasonably in doubt at the time of the challenged act. United States v. United Shoe Machinery Corp., D.C.Mass.1953, 110 F.Supp. 295, 348, affirmed 347 U.S. 521, 74 S.Ct. 699, 98 L. Ed. 910. It is true that the Supreme Court has recognized that in framing an antitrust judgment it is proper to consider whether the acts found to have violated the law "could reasonably have been thought permissible" at the time they were committed. United States v. United States Gypsum Co., 340 U.S. 76, 89–90, 71 S.Ct. 160, 170, 95 L.Ed. 89; F. T. C. v. National Lead Co., 352 U.S. 419, 429, 77 S.Ct. 502, 1 L.Ed.2d 438. Although the Court believes that there might be cases in which this consideration would be of importance, the fact remains that in this case the Supreme

Court has found the acquisition to be unlawful. The Court therefore approaches the problem on the assumption that the appropriate relief is that which is necessary to eliminate the effects of the acquisition offensive to the statute, notwithstanding that the acquisition might reasonably have been believed to be permissible when made.

■ In its opinion the Supreme Court recognized the fact that all concerned in high executive posts in both du Pont and General Motors "acted honorably and fairly, each in the honest conviction that his actions were in the best interests of his own company and without any design to overreach anyone, including du Pont's competitors." 353 U.S. 586, 77 S.Ct. 872, 884, 1 L.Ed.2d 1057. The Supreme Court thus accepted the detailed findings of this Court to the effect that in the commercial relations between du Pont and General Motors there was no fraudulent or improper conduct on the part of the officers and directors of both companies, and no overreaching of any kind. Here again, however, the Court concludes that these facts do not in any way mitigate or qualify the duty of this Court to frame a decree that will effectively remove and guard against the effects of the acquisition of the stock which have been held to be offensive to the statute.

Before referring to the evidence which was adduced at the hearing on relief there is another basic question which requires consideration.

The Government contends that in one important respect this Court has no discretion in the framing of its decree. It is the position of the Government that the Court must order a divestiture that will deprive du Pont of every aspect of ownership including even the bare legal title to the stock. If this contention is sound the question whether divestiture is in fact necessary in order to eliminate the effects offensive to the statute becomes immaterial because divestiture is a mandatory remedy even if some other form of relief would be equally effective, or even more effective, to remove the il-

legal consequences of the acquisition. By the same token, the fact that divestiture would inflict serious injury upon persons who were innocent of any wrongdoing would be immaterial. On this view of the matter the Court would possess discretion only as to the time and method of divestiture

The Government bases this argument primarily on the provisions of Section 11 of the Clayton Act, 15 U.S.C.A. § 21, which prescribe the procedure to be followed by the Federal Trade Commission and other administrative agencies in enforcing the provisions of the Clayton Act. No court has ever construed or applied Section 11 of the Clayton Act in the sense contended for by the Government. On the contrary it has been held that divestiture is not a necessary remedy under Section 7 and that measures other than divestiture may satisfy the requirements of the statute. American Crystal Sugar Co. v. Cuban-American Sugar Co., D.C.S.D.N.Y.1957, 152 F. Supp. 387, affirmed 2 Cir., 1958, 259 F.2d 524.

It is not disputed that the jurisdiction of this Court to hear and to decide a case arising under Section 7 of the Clayton Act and to frame a final judgment in such a case is derived from Section 15 of that Act. Indeed it was this section which the Government invoked when it filed its complaint. It cannot be denied that Section 15 is identical in form with Section 4 of the Sherman Act, 15 U.S.C.A. § 4, which confers equity jurisdiction on district courts to hear and decide suits for injunctive relief under that statute. It has long been held that under Section 4 a district court has the traditional powers of a court of chancery. There can be no doubt that in cases arising under the Sherman Act the discretion conferred on a court of equity by Section 4 is not confined or restricted by any requirement that divestiture of ownership is a mandatory remedy. Timken Roller Bearing Co. v. United States, 341 U.S. 593, 603, 71 S.Ct. 971, 95 L.Ed. 1199; United States v. Minne-

sota Mining & Manufacturing Co., D.C., 96 F.Supp. 356, 358. The question raised by the Government's contention is therefore whether Section 11 of the Clayton Act reads into Section 15 of that statute a restriction on the court's exercise of discretion which is not explicitly provided for in Section 15 and which is admittedly not imposed by the provisions of Section 4 of the Sherman Act.

The words of Section 11 provide no support for the suggestion that it was intended to have any limiting effect upon the jurisdiction exercised by the District Court under Section 15. The Court finds it unnecessary to decide whether Section 11 imposes upon the regulatory agencies a mandatory duty to order divestiture in every case in which it is found that stock has been acquired in violation of Section 7. The parties have taken conflicting views on this question. The defendants have pointed to certain cases which they contend indicate that the regulatory agencies have not construed Section 11 as requiring mandatory divestiture of ownership. See particularly I. C. C. v. Baltimore & Ohio Railroad Co., 183 I.C.C. 165, and New York, Chicago & St. Louis Railroad Co. Control, I.C.C. Finance Docket No. 17883 (report dated April 10, 1958, and order dated August 26, 1958). They have also referred to certain consent orders entered in F.T.C. proceedings, In the Matter of the Vendo Company, FTC Dkt. No. 6646 (1957); In the Matter of International Paper Co., FTC Dkt. No. 6676 (1957); In the Matter of Scoville Mfg. Co., FTC Dkt. No. 6427 (1956).

But even if it is assumed that Section 11 restricts the discretion of the regulatory agency it does not follow that the section similarly restricts the equity powers conferred on a district court by Section 15.

The particular sentence in Section 11 on which the Government relies is directed entirely to the procedure to be followed by an administrative agency in enforcing the provisions of the Clayton Act and does not even refer to the au-

thority of the district courts under Section 15. Indeed the section as a whole does not refer in any way to the jurisdiction exercised by a district court under Section 15. To the extent that it deals with judicial power at all it refers to the powers of a circuit court of appeals to enforce or to review an order entered by an administrative agency. In this connection it is significant that the power given to a court of appeals when it reviews an order of an administrative agency is a broad power to enter a judgment "affirming, modifying or setting aside" the order of that agency. It is hardly to be supposed that if Congress had intended to limit the historic equity jurisdiction of the district courts to frame judgments it would have done so in a section which does not refer to those courts or that it would have used words which required the alleged limitation to be derived entirely from inference or implication.

The Government attempts to support its construction of Section 15 by reference to certain statements made in the Congressional debates when the Clayton Act was passed. These statements which are not directed to the relationship between Sections 15 and 11 or to the particular point now under consideration are not persuasive or even relevant. They are entitled to no weight as against the statements in the reports of the committees recommending passage of the Clayton Act which make it clear that Section 15 was intended to confer upon the courts the same kind of equitable jurisdiction to enforce the Clayton Act that they possessed and exercised under Section 4 of the Sherman Act in cases arising under that statute. S.Rep.No.698, 63rd Cong., 2d Sess. pp. 17 and 50 (1914), and H. Rep. 627, 63rd Cong., 2d Sess. p. 21 (1914).

To adopt the interpretation of Section 11 advanced by the Government would lead to an extraordinary result. In terms of the present case it would mean that although the Court has no choice but to order divestiture in a proceeding under Section 7 of the Clayton Act, which involves only a probability of restraint or monopolization, it would have complete choice of remedies and would be under no mandatory duty to divest if there had been a violation of the Sherman Act rather than the Clayton Act and the Court had found either that du Pont's stock interest in General Motors was a combination or conspiracy that had restrained trade in violation of Section 1 or that du Pont had used its stock interest to achieve a monopoly position in violation of Section 2. Such a distinction in the powers of an equity court would be arbitrary and illogical and the Court finds nothing in Sections 11 and 15 to suggest that it was intended by Congress. Indeed the legislative reports cited above strongly indicate the contrary.

The Government also takes the position that the opinion of the Supreme Court in this case shows that divestiture is a mandatory remedy. The Court finds nothing in the language of the Supreme Court that appears to support this contention. Instead the Court speaks of the "large discretion" possessed by a district court to model its judgment "to fit the exigencies of the particular case". 353 U.S. 608, 77 S.Ct. 885, 1 L.Ed.2d 1057. These words would hardly be appropriate if the Supreme Court had intended to hold that this Court was under a mandatory duty to order divestiture.

Under Section 15 this Court has unqualified authority to order complete divestiture if it decides that in the particular circumstances involved that is an appropriate remedy and is required to achieve the purposes of the statute. But it is not compelled to direct divestiture or to direct any particular form of divestiture if it determines that there is an alternative form of relief. In the exercise of its authority under Section 15 the Court has the authority to adopt a form of relief other than divestiture, or to order divestiture of some but not all of the incidents of ownership if it decides on the facts that these alternatives are

more equitable and will effectively carry out the direction of the Supreme Court to eliminate the effects of the acquisition offensive to the statute.

In this connection the Court observes that in many instances both the Department of Justice and the Federal Trade Commission have consented to the entry of judgments under Section 7 of the Clayton Act which have not called for divestiture of the stock or assets acquired in violation of that section. See, e. g., United States v. Schenley Industries, Inc., CCH Trade Cases, Para. 68,664 (D.Del. 1957); United States v. General Shoe Corp., CCH Trade Cases, Para. 68,271 (D.Tenn.1956); In the Matter of Union Bag & Paper Co., FTC Dkt. No. 6391 (1957); and United States v. Hilton Hotels Corp., CCH Trade Cases, Para. 68,253 (N.D.Ill., 1956). Furthermore, so far as this Court is aware, this is the first case in the period of over 40 years during which the Clayton Act has been law in which the Government has advanced the contention that a district court acting under Section 15 of the Clayton Act lacks the traditional authority of a court of equity and must order divestiture upon a finding of a violation of Section 7.

The Government presented its evidence on twelve hearing days between February 17 and March 16, 1959. The defendants and the amici presented their evidence on twelve hearing days between March 16 and April 1. The Government presented its rebuttal on four hearing days, April 6, 7, 8 and 9. The Court then gave the Government twenty days to file a brief, and the defendants twenty days thereafter, the amici ten days thereafter, and the Government ten days thereafter to reply, so that the case was submitted to the Court in June, 1959.

 In considering the decree proposed by the Government, an important factor is the impact of taxes. The Government attorneys displayed their sensitivity on this point by introducing testimony regarding devices whereby individual stockholders of du Pont might seek to avoid the tax impact.

A member of an accounting firm testified, over objection, that stockholders might form corporations of various types to which they would transfer their shares of du Pont. Such corporations would then receive the General Motors shares distributed by du Pont as dividends under the Government proposed decree and, under some of the devices retain them and, under other devices, in turn, distribute the shares as dividends. These devices, if valid, would tend to minimize the taxes. However, it appeared that Government counsel had discussed the devices with lawyers in the Internal Revenue Service and there was doubt whether the Internal Revenue Service would recognize such devices as having substance. Further, Government counsel refused to state whether or not they would accept such devices from an antitrust standpoint or would attack them under the antitrust laws. The Court does not think that such devices can be seriously considered unless and until they are tendered as a plan acceptable to the Government and have been ruled on from a tax standpoint by the Internal Revenue Service.

 The defendants moved to strike this testimony as to domestic law as inadmissible. It would be in an ordinary lawsuit, but in this kind of proceeding it is informative to the Court, and the motion was denied.

Under the ruling of the Internal Revenue Service (Amicus Dallstream Ex. 2) there can be no avoiding the conclusion that the tax impact by reason of the distributions of 63,000,000 shares of General Motors stock by du Pont will be crushing in the case of individuals and trusts. They will be taxed at rates varying from 20% to 91% (less dividend received credits) by the Federal Government on the receipt of shares having a current market value of $45 or $55 per share. Whatever the value, or whatever the rate, these individuals will lose a large portion of their investment in General Motors through du Pont. In many instances there will also be state income taxes imposed. Many du Pont stockhold-

ers reside in the following states, with the income tax rates indicated: California (1% to 6%), Delaware (1½% to 8%), Massachusetts (7.38%) and New York (2% to 10%).

No doubt there are investors who purchased du Pont having in mind that, while they were acquiring an interest in the leading company in the chemical industry, they were also acquiring shares of stock in the leading company in the automotive industry. It would be grossly unfair to impose such a penalty on thousands of innocent persons. Section 7 of the Clayton Act is not a "penal statute". This is simply a remedial section. It contains no penal sanctions such as there are relating to certain other sections of the antitrust laws.

There are approximately 185,000 stockholders of record of du Pont. There are, of course, in addition many others whose stock is held in the name of banks or brokerage firms or who are beneficiaries of trusts owning du Pont stock. All of these persons would be taxed on the same basis as if they were direct owners of du Pont stock. Testimony and exhibits were introduced by Dr. Benjamin Tepping of National Analysts, Inc., an independent statistical research organization. This organization conducted a survey of du Pont stockholders for the purpose of determining the tax-paying characteristics of such stockholders and of estimating the additional income taxes that would be payable if the Court were to accept the Government's proposal. The National Analysts' survey was conducted on the basis of probability sampling. This is a method of sampling by which on the basis of data obtained from a sample of the group under examination estimates can be made as to the result that would be obtained if a complete census of the entire group had been undertaken. The particular utility of probability sampling is that through the use of mathematical formulae the margin of error between the results of the sample and the results that would be obtained from a complete census can be ascertained.

Dr. Tepping was able to include within his survey the individual holders of some 16,000,000 shares of du Pont stock (out of a total of some 45,000,000 shares) and to estimate for such holders the effective rate of tax and the additional taxes that would be payable if the Government's proposed judgment were accepted by this Court. In addition Dr. Tepping stated as his expert opinion similar estimates for the owners of an additional 9,000,000 shares of du Pont stock, basing these estimates very largely upon an extension of the results obtained in the sample survey. His testimony, in summary, was that these two groups of individual owners of du Pont stock would pay income taxes at the rate of between 55% and 60% if the Government's proposal were accepted and that the additional income taxes payable by such owners upon receipt of the General Motors shares in accordance with the Government's plan would total as much as $1,000,000,000 over the ten year period if the General Motors stock were to have a value of approximately $50 a share and would total approximately $770,000,000 over the same period if the General Motors stock were to have a value of about $40 a share.

The Court is satised that the National Analysts' survey was conducted on an objective basis and that the procedures used were in accordance with accepted standards recognized in the field of statistical surveys. The evidence shows that care was taken to simplify the questionnaires used to the extent possible in light of the fact that the subject matter— Federal income tax—is inherently complicated. At the trial the Government moved to exclude the testimony of Dr. Tepping and the exhibits introduced by him on the ground that the underlying data constituted hearsay evidence. The Court overruled the motion and at the conclusion of the trial it was renewed by the Government.

If the issue before the Court were the precise amount of income taxes to be paid by the du Pont stockholders in the aggregate or by individual classes of du Pont stockholders, there might be merit to the Government's contentions. But that is not the issue. The court is satisfied that the estimates are sufficiently reliable to indicate the order of magnitude of the income taxes that would be occasioned by adoption of the Government's proposal. Accordingly, the Government's motion is overruled. In this connection the Court observes that in its reply brief with respect to this motion the Government states:

"It has never been any secret throughout this proceeding that the proposed distribution of General Motors stock would be taxable to the stockholders. A bill has been introduced in the Congress concerning this matter. This is a matter of law so obvious that the Court is not even required to take judicial notice of it. If the only use to be made of these survey results were to allow the Court to consider them for whatever they are worth, the Government would not object."

The practical question before the Court is whether it will be better able or less able to frame a decree to carry out the mandate of the Supreme Court by excluding Dr. Tepping's testimony and evidence. To this question the Court believes there is but one answer. It cannot perceive how the interests of the Government can be prejudiced by acceptance of this testimony on the basis and for the purposes described above. Moreover, there is ample precedent for the use of such evidence. The magnitude of the taxes occasioned by the Government's proposal is certainly an important element in this case and all of the parties, including the Government, should be anxious to provide the Court with the best available information. The evident care and objectivity with which the survey was conducted, and which were not criticized by the Government's own statistical expert, assure a high degree of trustworthiness. The record discloses that various agencies of the Government itself have used surveys of this type and indeed have employed this same organization, National Analysts, Inc. Support is also found for the competence and trustworthiness of sample evidence in the following court decisions: United States v. Aluminum Company of America, D.C.N.Y.1940, 35 F.Supp. 820, 823–824; United States v. United Shoe Machinery Corp., D.C.Mass.1953, 110 F. Supp. 295, 305–306; United States v. E. I. Du Pont De Nemours & Co., D.C.Del. 1953, 118 F.Supp. 41; United States v. National Football League, D.C.E.D.Pa. 1953, 116 F.Supp. 319; State Wholesale Grocers v. Great A. & P. Tea Co., D.C. N.D.Ill.1957, 154 F.Supp. 471. It further appears that in only one recent case has such sample evidence been rejected and in that case certain survey findings offered by the Government were excluded because they utilized arbitrary methods and classifications not recognized in the industry under study. United States v. Brown Shoe Co., Inc., D.C.E.D.Mo., Civil No. 10527(3), 1958. Neither of these objections has application to the survey of the National Analysts.

Mr. David M. Kennedy, Chairman of the Board of the Continental Illinois Bank and Trust Company of Chicago and also Chairman of its Trust Committee, presented an estimate that beneficiaries of trusts in its Trust Department holding du Pont stock were on the average in the 50% to 60% bracket. Mr. Thomas H. Beacom, Vice President in charge of the trust Department of the First National Bank of Chicago, estimated that the beneficiaries of the trusts in his bank holding du Pont stock would be taxable at an average rate of 51.7%.

Whatever disagreement may be had with these estimates regarding the tax brackets of individual and trust beneficiary stockholders of du Pont, there can be no doubt that du Pont stock, selling for $200 a share or more (now $250 a share), is held in many instances by people of substantial income, and that

the tax impact would be very serious as to them. Seventeen individual stockholders of du Pont and General Motors in various walks of life testified regarding their family holdings, their taxes and their intention as to selling or not in case the Government plan were put into effect, as summarized below:

| Witness | Residence | Status | Holdings | Additional ann. taxes or bracket | Intention |
|---|---|---|---|---|---|
| Paul H. Kuhns | Ponca City, Okla. | Retired Cont. Oil | 50 du P. 60 G. M. | $60 | Sell both |
| F. A. Christensen | Wash., D. C. | Retired Mfrs. Rep. | 600 du P. | 47%—$1,126 | Sell both |
| A. B. Moran | Detroit, Mich. | Investment broker | 964 du P. | 47%—$2,074.80 | Sell G. M. |
| Claude E. Holland | Beaumont, Tex. | Insurance agent | 250 du P. 630 G. M. | 59%—$761 | Give away du P. to children |
| Mrs. W. C. Bedell | Poughkeepsie, N. Y. | Wife of surgeon | 15 du P. 33 G. M. | 30% $21.52 | Keep both |
| Wm. F. Schwenke | Schererville, Ill. | Du P. Dept. supervisor (about to retire) | 131 du P. | 26%—$187 | Sell G. M. |
| Harold A. Roscoe | Highland, Ind. | Du P. engineer | 41 du P. | 26%—$57 | Keep both |
| Raymond J. Govert | Griffith, Ind. | Du P. Asst. Supt. | 62 du P. | 22%—$75 | Keep both |
| Norman R. Wallner | Lansing, Ill. | Du P. Chem. Engineer | 30 du P. | 22%—$35 | Keep both |
| Henry L. Payte | Jersey City, N. J. | Tax accountant (retiring) | 40 du P. 341 G. M. | 30% | Sell 30 du P.; sell G. M. received as dividend; undecided as to G. M. now owned |
| Maxwell Turner | Fall River, Mass. | Auctioneer | 60 du P. 210 G. M. | 22% | Sell both |
| Elizabeth Babbitt | Chicago, Ill. | Writer | 630 du P. | 30% $896 | Sell G. M. |
| Walter F. Pond | Greybull, Wyo. | Geologist | 60 du P. 300 G. M. | 34% | Undecided |
| Leon A. Miller | St. Petersburg, Fla. | Retired engineer | 160 du P. 126 G. M. | 22% $158 | Undecided |
| Richard C. Peter | Louisville, Ky. | Manufacturers agent | 692 du P. 412 G. M. | 43% plus 8% Ky. $1,298 addl. Fed. taxes | Sell G. M. to pay tax |
| Archie J. Marschak | Chicago, Ill. | Bank asst. vice pres. | 66 du P. | 34% | Sell G. M. |
| Harvey H. Orndorff | Chicago, Ill. | Investment banker | Trustee for elderly woman of 1,000 du P. | 84% $4,636.80 | Sell du P. |

It was assumed for the purpose of the above testimony that General Motors would have a market value of $40 per share when distributed. Most of the above stockholders expressed the opinion that they would not get the fair value of the shares which they would have to sell because of the race to get into the market.

The shocking tax impact [5] would impel the Court not to order a distribution of General Motors stock by du Pont, if any other means of removing the effects offensive to the statute are available, and there are such means.

In case tax legislation, such as S. 200, were to pass, this tax result from ordering a distribution would, of course, be eliminated.

The Government proposed decree also calls for the sale by a trustee of the General Motors stock received through dividends by Christiana and Delaware, as well as the 535,500 shares of General Motors owned by Christiana. Christiana owns 12,199,200 shares of du Pont. Delaware owns 1,217,920 shares of du Pont and 49,000 shares of common stock of Christiana. Under the Government plan Christiana would receive 16,805,684 shares of General Motors and Delaware would receive 1,677,813 shares of General Motors. Accordingly, including the 535,500 shares owned by Christiana there would be sales of stock owned by the two corporations amounting to 19,-018,997 shares. The tax base for such General Motors shares is $2.09 a share (except that for the 535,500 shares owned by Christiana it is $9.01 per share). Any proceeds of such sales in excess of those base figures per share would be subject to a capital gains tax of 25%. The market value of General Motors stock at the time of the hearings was $46 per share. If that figure were realized, the capital gains tax impact on Christiana would be $183,351,000 and on Delaware would be $17,831,000 or a total of $201,182,000. In addition, there would be dividend taxes of $3,021,000. Even if much less were realized, because of a decline in the market value of General Motors, the tax impact would still be staggering.

There are over 4,000 stockholders of Christiana and Delaware, including many charitable and educational institutions. See page 30 of 177 F.Supp. for a list of many such institutions. There is no finding of violation of any law against either Christiana or Delaware or their stockholders and, again, it would be unjust to impose this loss upon them. The Court is not aware of any proposed legislation which is receiving serious consideration in the Congress, designed to give relief from taxes on the gains from such sales. Consequently, the Court would not order the sale of shares owned or received by Christiana and Delaware, if there were any other means of eliminating the condition offensive to the statute. There are such means.

As previously stated, in its memorandum of September 26, 1958 the Government suggested a stretch-out of its plan over a twenty-year period as against a ten-year period. This would not change the tax impact on the individual shareholders of du Pont, but simply spread it out over a longer period. Nor would this change the tax impact on Christiana and Delaware and their stockholders of sales by the trustee. It would simply spread out the impact over a longer period.

Also, the Government memorandum made the suggestion that du Pont might make a single distribution of the 63,000,000 shares of General Motors and pointed out that, under present tax laws, the total value of the General Motors shares would not be taxed to the recipients as a dividend, but only that portion representing the accumulated earnings

---

5. It was testified by Dr. Jacoby (whose testimony is discussed below) that as an economic matter the tax was a capital levy and that this penalty would not fall equally on shareholders of du Pont according to their holdings of shares of du Pont, but the penalty would be different on each, depending on the tax brackets of the various stockholders due to other income.

and surplus of du Pont. Schedules were introduced by du Pont showing the tax impact of such a distribution on individuals and trust beneficiaries, and assuming a market value of $45 per share for General Motors stock. The total figure was $588,044,000. These figures would not indicate that a single distribution by du Pont would eliminate the severe tax impact of the Government proposed decree.

The economic consequences of the Government proposed decree to be considered are the effect on the market price of General Motors common stock, on the market price of du Pont common stock, and on General Motors Corporation itself, that is, its ability to finance its operations during the ten-year period of the Government decree.

If there is a drastic decline in the market value of General Motors stock, this will affect the stockholders of du Pont who sell their General Motors shares to raise money to pay taxes, Christiana and Delaware and their stockholders through losses on the sale of their General Motors shares by the trustee, and existing stockholders of General Motors who feel forced to sell or who have General Motors pledged as collateral, or who have General Motors in portfolios which must be carried in their reports at market value.

If there is a drastic decline in the market value of du Pont common stock, this will have an impact on the stockholders of du Pont, both individuals and trustees, who feel forced to sell to avoid the problems and the tax consequences of constant receipt of General Motors shares as a dividend. It will also have a direct effect on Christiana and Delaware and their stockholders, and on other stockholders of du Pont who have the stock pledged or in portfolios which must be marked to the market.

If there is a drastic decline in the price of General Motors common stock, this could interfere with the ability of General Motors to do financing during the ten-year period of the Government proposed decree.

The Government called witnesses to give three types of testimony on this phase of the case designed to show that the Government's proposed decree would have little impact on the market prices of General Motors stock and du Pont stock.

One type of evidence was to the effect that there was considerable investment money coming into the market regularly. (The other two types which will be discussed later were (a) testimony of analysts and statisticians, and (b) testimony regarding offerings of securities of various types which had been made in recent years.) But there was no convincing evidence in this category that any substantial portion of this investment money would be directed to buying General Motors stock at the true value of the stock, if the Government decree were in effect.

Mr. John J. Scanlon, Treasurer of American Telephone & Telegraph Company, testified that the Bell System pension plans expected to invest $15,000,000 to $20,000,000 a year in equity securities, but that the trustee of the trusts had a policy of diversification, so that only a small amount of this would go into any one common stock.

Mr. Edward G. Kinloch, Manager of the Trust Investments Operations Department of General Electric Company, testified that 25% to 30% of the $75,-000,000 to $80,000,000 invested annually by its pension trusts would go into equities, but only 4% of the money for equities would go into automotive stocks, and less than half of this into General Motors, even under present conditions. This would amount to less than $400,000 per annum. Mr. Kinloch also said that, if the trustee sales called for by the Government plan were to take place, he would be somewhat cautious and whether he would make any purchases of General Motors stock would depend on market conditions.

Dr. James J. O'Leary, Director of Economic Research of the Life Insurance Association of America, said that, according to a study he had made for a committee of the Senate, twenty-five life

insurance companies, owning 85% of the common stocks held by insurance companies, made net purchases between January, 1953, and September, 1955 of only $7,700,000 of common stocks. He testified that the insurance companies had to diversify their common stock investments and, therefore, could put no great amount in any one stock. He also said that, assuming the Government proposal were put into effect, the insurance companies would be inclined to buy General Motors if that stock declined in price sufficiently.

Mr. Harold S. Oberg, Research Director of the National Association of Investment Companies, testified these companies made net purchases of over $1,-000,000,000 in common stocks in 1958, but he did not know whether they purchased General Motors stock, and said they all had a policy of diversification so as to limit investments in any single stock.

Mr. Dudley A. Hall, of the Boston Management Research Company, testified as to investment of college endowment funds in common stocks, including Christiana, du Pont and General Motors, as shown by surveys of his Company. The surveys showed that the amount invested by colleges in these three companies' stocks had decreased substantially between June 30, 1957 and June 30, 1958.

Mr. George E. Johnston, Chairman of the Board of Equity Annuity Insurance Company, testified that although life insurance companies had over $101 billion dollars in total assets, they had invested less than 4% in common stocks. He said that the sale of variable annuities by life insurance companies might expand, but that depended on a pending case in the Supreme Court and on legislation;[6] and that, while funds behind variable annuities would be invested in common stocks, there would be a policy of diversification as between industries and as between companies within an industry.

Mr. Clarence Stanley, Vice President and Pension Coordinator of General Motors Corporation, testified that the General Motors pension trusts held only $5,-330,000 of General Motors common stock, representing .68% of the combined assets of the trusts.

Mr. Vito Natrella, Chief Economist of the Trading Exchanges for the Securities and Exchange Commission, testified as to the large amounts of stocks in the hands of various types of investors. He said that his figures did not show that a particular institution would buy any particular stock at any particular time.

Dr. Roger F. Murray, Professor of Finance at the Columbia University Graduate School of Business, testified that pension funds would regularly invest 1⅔% of the money invested in equities in common stock of General Motors. However, this testimony must be considered against that of an active administrator of large pension funds, Mr. Kingsley Kunhardt, Vice President in charge of the Investment Department of Guaranty Trust Company of New York, administering 217 pension funds with assets of $2,000,000,000. Mr. Kunhardt, who testified for du Pont, said that Guaranty Trust Company would not put any fixed portion of pension funds into General Motors stock. He testified that if the Government plan were put into effect the trust company would be a buyer of General Motors stock for pension trusts only at a greatly reduced price.

Mr. Carrol Shanks, President of Prudential Life Insurance Company, testified that his company would like to get into the variable annuities business and was supporting legislation to that end, but that it would be fairly slow going and

6. Since this testimony the Supreme Court of the United States has decided the case referred to adversely to the insurance companies, holding that sale of variable annuities would have to be registered with the S.E.C., under the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., and under the Investment Company Act of 1940, 15 U.S.C.A. § 80a–1 et seq., Securities and Exchange Commission v. Variable Annuity Life Ins. Co., March 23, 1959, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed. 2d 640.

the money that would go into variable annuities would be diverted from other types of savings, among them direct stock purchases in the market.

Mr. Jack Morgan, Comptroller of the Savings and Profit Sharing Pension Fund for Sears, Roebuck & Co., said this fund now has assets of over $1,000,000,-000, 10.6% of which are in common stocks but that the fund owned no General Motors stock.

Mr. Edward T. McCormick, President of the American Stock Exchange, testified that institutional investors should grow to be a very substantial factor in the market.

In its brief of April 29, 1959 and accompanying proposed findings, the Government contends that, if General Motors purchased stock for its bonus plan, savings plan and stock option plan from the trustee for Christiana and Delaware, this would absorb all the shares offered by the trustee and would not disturb the market. The Government points out that the General Motors stock purchased in recent years for the bonus plan has amounted to 1,000,000 shares per annum, that the trustee for the Savings Plan has purchased in the last three years about 1,000,000 shares of newly issued General Motors stock per annum, and that there are outstanding options under the option plan to purchase 363,859 shares, first exercisable September 18, 1959.

The buying of stock in the market for the bonus plan is already a factor in the market and to withdraw it from the market to shift it to purchases from the trustee for Christiana and Delaware would not add any new demand to offset the increased supply of General Motors stock which would be offered by the trustee and others as the result of the Government proposal.

As to purchases of General Motors stock for the savings plan, the Board of Directors of General Motors has chosen so far to have the trustee for the plan purchase newly issued shares from General Motors, which is a continuing source of capital funds to the Company. The Court doubts the propriety of attempting to dictate the financial policy of General Motors by reason of the finding of a violation of Section 7 of the Clayton Act by du Pont.

The amount of stock for which options are outstanding is too insignificant in relation to the problem here to warrant discussion.

This type of evidence does not have any substantial probative force to indicate that any demand for General Motors stock would spring up to counterbalance the increased supply in the market which would be created directly and indirectly by the Government's proposed decree.

The second type of evidence adduced by the Government relating to the impact of the Government proposed decree on the market prices of General Motors and du Pont stocks was the testimony of statisticians and analysts in the academic or professional field. These men were Dr. Roger Murray of Columbia, previously referred to, Dr. Erwin Friend, Professor of Economics and Finance at the University of Pennsylvania and Mr. Alfred Boni, the author of the study filed with the Government memorandum of September 26, 1958. In rebuttal Mr. Paul L. Howell, an economist, also testified for the Government.

These men each testified that they had never been in the underwriting business and had no experience in the marketing of stocks or other securities. They placed their reliance on charts and statistics. But there were no charts and statistics relating to any situation remotely approaching the forced sale of 2,000,000 shares of General Motors stock every year for ten years, accompanied by other sales for tax purposes by recipients of General Motors stock as a dividend, and other sales by existing holders of General Motors stock. Nor did these charts or statistics encompass any market situation such as that relating to the du Pont stock under the Government plan where many present holders would decide to sell and take a capital gain rather than incur the ordinary income taxes on the

General Motors stock to be distributed to them, and any potential individual purchaser of du Pont stock would be faced with buying a tax liability if he made the purchase.

Dr. Murray testified that he would defer to the judgment of investment bankers as to the price which the trustee would obtain for the General Motors stock. Dr. Friend agreed that there had never been anything in the past comparable to the sales contemplated by the Government plan. He also testified that an increase in supply in stock of 10% had in the past brought about a decline in price of roughly 5%, that an increase of 20% had been associated with price declines of between 10% and 15%. There was no testimony by Dr. Friend as to the effect of an increase in supply of 30%.

The Government plan provides for an increase in supply of 30%. Du Pont owns about 23% of General Motors outstanding common stock, making the present supply not more than 77% of the outstanding stock. 23%, the increase in supply following distribution by du Pont, is about 30% of the 77%, the existing supply.

Mr. Boni's testimony was devoted principally to asserting that "volume" of transactions in a stock did not have any co-relation to price movements in the stock. The fallacy of this testimony is that volume of transactions is not the same thing as increase in supply without an increase in demand. Furthermore, Mr. Boni's testimony was based solely on the assumption that the sales by the trustee under the Government plan would take place by several brokers to be employed by the trustee in the auction market on the floor of the New York Stock Exchange,[7] whereas the testimony of all the investment bankers was that the only practical way of making the sales would be in a secondary offering off the floor of

a stock exchange by a nationwide syndicate of underwriters, including large underwriting houses not members of the New York Stock Exchange, and with a spread several times the amount of an ordinary stock exchange commission.

Therefore, this type of testimony adduced by the Government has little or no weight as showing that the Government plan would have little or no impact on the market.

In particular, the Court was not persuaded by the testimony of Mr. Boni or Mr. Howell. The statistical tables from which the former drew his conclusions were prepared in a loose manner which could hardly be said to comply with accepted standards of statistical approach. His demeanor on the stand and his inability to give specific answers to the questions addressed to him left the Court with the conclusion that little or no reliance could be placed on his expert opinion. The opinions which Mr. Howell expressed in the course of the Government's rebuttal were completely unsupported by any evidence that he had studied the issues before the Court. While he stated those opinions freely, in view of their lack of foundation the Court cannot attach any weight to them.

The third type of testimony introduced by the Government as to market impact of its plan was statistics and oral testimony relating to offerings of securities which had taken place in the recent past. There were three kinds of offerings referred to, (a) offerings of debt securities, (b) offerings of common stock by corporations to their own stockholders following the issuance of negotiable rights to subscribe to the stockholders at substantial discounts from the current market, and (c) secondary offerings of common stocks by others than the issuing corporations.

---

**7.** There was testimony from an experienced broker to the effect that an attempt to sell 2,000,000 shares of General Motors on the floor of the New York Stock Exchange through brokers employed by the trustee would so disorganize the market that the specialists would call in floor members of the Board of Governors, and the Board of Governors would stop the sales and recommend that they be made through a secondary distribution off the floor.

From the testimony it is clear that offerings of debt securities, even if convertible into common stock, have little or no relevance to the secondary offering which would have to be made by the trustee under the Government plan.

Also, from the testimony it seems plain that rights offerings by corporations to their own stockholders have little relevance because of the difference in the circumstances. In rights offerings the corporation is free to fix a subscription price substantially below the current market. Then the stockholder receiving the rights can sell the rights. The offering is made to a body of people already interested in the company. Anyone exercising a right can borrow from a bank 75% of the value of the stock, whereas under existing regulations on a secondary offering the purchaser can borrow only 10%. Further, in a rights offering the valuable mechanics of purchasing rights and exercising them and selling the stock so acquired is available to the underwriters, a process known as a "lay-off". This procedure has a stabilizing effect and is very helpful to the success of the operation. However, it is not deemed "stabilization" under present rules and underwriters can purchase such rights without reference to the stringent stabilizing rules of the Securities and Exchange Commission. The "lay-off" procedure is, of course, not available in a secondary offering.

There remains the testimony and statistics regarding large secondary offerings of common stock which have taken place in recent years. None of them is similar to what would take place under the Government plan. Only five (one being a series) need be discussed.

There was a secondary offering of Ford Motor Company common stock at $64.50 per share by a group of underwriters in the amount of about $650,000,000 by the Ford Foundation in 1956. Ford stock was not owned by the public at the time and was not listed on any exchange. Ford was a renowned company with a glamorous reputation. Although the Ford Foundation owned and retained substantially more stock, there was no threat of forced sales of this stock. As Winthrop C. Lenz, Vice President in charge of the Corporate Underwriting Division of Merrill, Lynch, Pierce, Fenner & Smith, Inc., one of the managing underwriters, testified, investors felt that the Foundation would make further sales only under favorable circumstances.

A Government witness, Mr. Ralph C. Sheets, Vice President in charge of sales at Blyth & Co., testified regarding another secondary offering of Ford stock by the Ford Foundation on March 31, 1959. Blyth & Co. was one of the managing underwriters. It was brought out on cross-examination of Mr. Sheets that the market price of Ford stock was substantially less at the time of this secondary offering than the offering price under the offering previously referred to, whereas the industrial stock averages had increased substantially over the same period. It was also developed through Mr. Sheets that the second offering presented a more difficult selling job although much smaller ($113,000,000 against $650,000,000) than the first and had a larger spread for the underwriters and dealers—$2 a share as against $1.50; $2 being 3.54% of the offering price of $56.50. The second offering of Ford stock was considered successful, as was the first. The second offering was made at a particularly favorable time both from the standpoint of the general stock market and also from the standpoint of the sales and earnings of the Ford Motor Company, which were sharply up in the early part of this year.

There was a secondary offering of 1,-278,833 shares of General Motors stock made by the Sloan Foundation in 1956 through a syndicate headed by Morgan, Stanley & Co. at $43.75 per share, and with a spread of $1.35 per share. Both Mr. Sumner B. Emerson, a partner of Morgan, Stanley & Co., and Mr. Lenz of Merrill, Lynch, Pierce, Fenner & Smith, another member of the underwriting group, testified that the offering had a substantial adverse effect on the market price of General Motors. Schroeder

Boulton, partner in charge of research of the New York investment house of Baker, Weeks & Co., a Government witness, testified that the Sloan secondary offering had caused a decline in market price and that, if repeated year after year, would have a much greater depressing effect. But, here again in the Sloan secondary offering of General Motors stock, there was no threat of additional forced selling of General Motors stock.

A series of secondary offerings referred to by the Government were the offerings of stock of Aluminium, Ltd., pursuant to a court decree of divestiture entered in 1951. These offerings were much smaller in amount than those involved here and they had a depressing effect on the market for Aluminium stock. Mr. Edward Townsend, Vice President and Director of First Boston Corporation, who managed the underwriting group, testified that the offerings had short-term market effects and that, in one or two of the offerings they were disappointed with the after-market.

Dr. Friend also testified for the Government regarding the secondary offering of 1,800,000 shares of A. & P. stock at $44.50 per share on March 24, 1959. It was brought out on cross-examination that from some time before the offering was made or known about in the markets to the time of offering, i. e., from January to March 24, 1959, the market price of the A. & P. stock declined 15½% against the Dow Jones industrial average.

In this connection the Court would like to point out that the Government witnesses repeatedly referred to the fact that charts showed that the market prices of stocks involved in offerings "recovered" after the offering. That is, of course, a small comfort to those stockholders whose stock was sold at the low prices on the offering or who felt compelled to sell on their own volition during the period of the offering. Furthermore, the sellers on the offering are compelled to lose in addition the cost of the underwriting, i. e., the spread, which is substantial.

There were no other secondary offerings on which evidence was introduced which seem to have any real materiality.[8]

The circumstances surrounding these secondary offerings are not similar to the circumstances which would surround the execution of the Government proposal. In any event, in most instances the offerings did have a depressing effect on the market price of the stock involved. The second Ford offering is an exception, but the conditions under which it was made were extremely favorable and unlike those which would accompany the execution of the Government proposal.

The Court is of the opinion that this evidence gives no assurance that the execution of the Government proposal would not have a serious depressing effect on the market value of du Pont and General Motors stock and would not cause serious losses to those who sell such stocks for whatever reason during the period while the decree is being executed. To accept the responsibility of entering a decree such as the Government proposes, the Court must have reasonable assurance that serious adverse economic effects will not result.

This is apart from the impact of the taxes on innocent persons which the proposed Government decree would have under the present tax laws. The Government adduced no evidence as to what the economic impact might be in case the tax laws were amended along the lines of S. 200, making distributions exempt from taxation. Under such circumstances there would still be the impact of the forced sales by the trustee under the Government plan and the heavy taxes on Christiana and Delaware.

The Government called no witness who had responsibility in his business to invest large funds or to market large blocks of stock who testified that the Government plan would not have a serious mar-

8. The Government has not asked for any findings regarding the Campbell Soup stock offering.

ket impact on the market for the stocks of General Motors and du Pont. Men of that type who were called by the Government either testified to the contrary on cross-examination or testified on other points. For example, the Government presented as witnesses Mr. Shanks, President of the Prudential Life Insurance Company, Mr. Townsend, of First Boston Corporation, Mr. Sheets, of Blyth & Company, and Mr. Weiss, of Bache & Company. All of these men had extensive practical experience in buying and selling securities and it is significant that the Government asked none of them to testify as to their opinion of the market consequences of the judgment proposed by the Government.

In contrast to the type of evidence introduced by the Government on this phase of the case, the defendants introduced the testimony of men charged with the responsibility of investing large funds and men of wide experience in the business of marketing large blocks of stocks and other securities. The defendants also called one economist.

The defendants introduced the testimony of Mr. Sumner B. Emerson, since 1936 a partner or officer in Morgan, Stanley & Co., one of the leading underwriting firms in the country. Mr. Emerson is in charge of handling underwritings of stock offerings and other securities underwritten and sold by his firm. His testimony was that the probable impact of the adoption and execution of the Government plan on the market price of the common stock of General Motors would be in the area of 20% to 25% below what the stock would sell for in the absence of such a plan. In making this estimate he took into consideration the periodic forced sales by the trustee and also other selling which would take place, particularly by stockholders of du Pont who received General Motors shares and had to pay ordinary income taxes on the value thereof at the time of receipt. He also thought that the figure of 20% to 25% might be exceeded in periods when the stock market was thin or tending downward.

Mr. Emerson assumed that sales by the trustee would be made through experienced underwriters, and sales by others would be scattered and disorganized. Those selling through underwriters would lose not only the reduction in market price but also the expense of the offering, i. e., the spread, estimated at $1.50 per share upward.

Mr. Emerson said that the offering and the situation surrounding it were without precedent, and that the market impact would be greater than that of any other offering of which he knew. Emerson further testified that it would not be feasible for the trustee to make the sales in the first 10 years under the limitations in the Government proposal. In other words, the trustee would not receive the fair value of the stock.

This witness also held the opinion that the adoption of the Government plan would have a serious impact on the market price of the common stock of the du Pont Company. He said there would be very heavy selling because of the heavy tax on the receipt by such stockholders of General Motors shares. For this purpose Emerson used a table he had had prepared showing the tax advantage of selling the du Pont stock and paying a capital gain tax, as against receiving the General Motors stock as a dividend on du Pont stock and paying ordinary income tax on its value. He estimated that 4,-000,000 shares of du Pont would be offered for sale. He contrasted with this the annual volume in the last 2 years on the stock exchange, which was approximately 800,000 shares.

Emerson pointed out that there would not only be no increase in demand for du Pont stock but a decrease in demand, because individuals buying du Pont would be buying into a tax problem and trustees buying du Pont would be buying into a tax problem and an allocation problem. He said there would be some increased buying by corporations and institutions if the price decreased sufficiently.

Mr. Emerson estimated that, if the Government proposed decree became ef-

fective, du Pont stock would sell at least 25% under what it would otherwise sell for, and the decrease might be much larger. He said that this reduction in market value would be over and above the decrease in the market value of the stock of du Pont due to the distribution of the General Motors stock.

Mr. Emerson was also asked about the suggestion in the Government memorandum of September 26 that the General Motors stock be distributed by du Pont in lieu of cash dividends. He was of the opinion that this would increase the impact on the market price of General Motors because more General Motors would be sold by stockholders of du Pont who would otherwise have no cash income from du Pont. He estimated the impact in this case would be from 25% to 30%. He said it would increase the impact on the market price of du Pont stock, for people dislike a stock that pays no cash dividends. He estimated the impact under such a plan would be between 30% and 35%.[9]

Emerson was asked about the further suggestion in the Government's Reply Memorandum that the period for distribution and selling be stretched out to twenty years instead of ten. He thought the impact on General Motors stock would be less than under the ten-year plan, that is, 12% to 15%. He also estimated that such a plan would have an impact on the market value of du Pont stock of at least 15%.

Tabulations were introduced through Mr. Emerson showing the loss to Christiana which would result from the execution of the Government proposed decree, assuming various sales prices received by Christiana for General Motors

stock. Taking prices estimated by Emerson, that is, after a market impact of 20% and 25%, the loss from the then current market value of $46 per share, including cost of selling and taxes, was $332,429,000 and $362,412,000, respectively. A similar tabulation for Delaware, but including additional loss on the asset value of Christiana shares owned by Delaware, was $140,870,000 and $153,566,000, respectively. The combined realized losses were shown on these tables for the two companies at $364,-694,000 and $397,578,000, respectively. These figures are not the sum of the separate figures for the two companies but eliminate duplication which would occur from simply combining such figures.

To present the effect of the Government plan on Christiana and Delaware, further tabulations were introduced through Mr. Emerson giving pro forma income of Christiana based on reinvestment of the net proceeds of the sales of General Motors shares at a yield equal to the current yield on the Dow Jones industrials and contrasting that pro forma income with actual income for 1958. This showed a decrease of 26.8%. The same figure for Delaware showed a decrease of 26.6%. Similar tables were introduced showing the effect on the income of Christiana and Delaware in case a bill such as S. 200 were enacted. The decrease would not be dissimilar. It was 25% in the case of Christiana and 24.6% in the case of Delaware.

Not only do compilations from the lists of stockholders of Christiana, du Pont and General Motors show that many charitable and educational institutions own shares in these companies, but there are large holdings of this type which do

9. If this sort of plan were adopted the du Pont Company would accumulate a vast amount of cash and there would be a problem of how to reinvest it. Mr. R. Russell Pippin, Treasurer of du Pont, testified that this would result in a cash accumulation of up to $2,835,000,000. He said that the company would have no use for this cash to fulfill its capital requirements in the chemical industry. He said the company had no skills to go into other lines of business. He thought that it would be unwise to turn part of the company into a huge investment trust. He compared this sum of $2,835,000,000 with the size of the largest investment trust in the country, i. e., Massachusetts Investors Trust, with assets of about $1,500,000,000. He also spoke of legal problems which might arise if du Pont acquired other companies or their securities.

not appear from the stock lists. The following information was introduced in evidence regarding the holdings of Harvard University, Massachusetts Institute of Technology, the University of Chicago, and, in the case of Christiana, by a group of colleges and universities as of recent dates:

Harvard (including Harvard Yenching Institute): 526 shares Christiana; 6,584 shares du Pont; 84,189 shares General Motors.

M.I.T.: 360 shares Christiana; 5,335 shares du Pont; 206,831 shares General Motors. These M.I.T. investments had a total market value as of December 31, 1958, of $16,454,491, representing 10.88% of M.I.T.'s investment portfolio (not including real estate). The market price for Christiana shares used in this computation was $14,100. Christiana stock is not listed on the New York Stock Exchange but is traded in the over-the-counter market.

University of Chicago: 150 shares Christiana; 4,460 shares du Pont; 21,815 shares General Motors.

A group of 14 tax-exempt institutions (excluding the University of Chicago's 150 shares) held 1,519 shares of Christiana on June 30, 1958. These would have a market value of $21,417,900, using the per share figure just stated. The total holdings in Christiana including Harvard, M.I.T. and Chicago have a market value of $36,025,500.

Mr. Dallstream, amicus curiae, questioned Mr. Emerson on features of his voluntary takedown proposal. Mr. Emerson was of the opinion that the present du Pont common stock would sell at a slightly lower market value than a combination of a du Pont Special Common and an allocable number of shares of General Motors. Mr. Emerson said there would be buying by arbitragers. He testified that certain classes of shareholders would find the takedown attractive, assuming the tax effects contended for by Dallstream—tax-free institutions, corporate stockholders, investment trusts and foreign holders. An arbitrager, David T. Skall, Vice President of A. G. Becker & Company, Chicago investment bankers, testified that the new du Pont Special Common would be more desirable than the old common because it would not be under the cloud of a possible future compulsory divestiture of General Motors stock by du Pont. He said that a corporate arbitrager would have a particular advantage under the tax laws in purchasing present du Pont common, taking down General Motors and selling the General Motors and the special du Pont.

Another experienced underwriter who testified for the defendants was Mr. Winthrop C. Lenz, a Vice President of Merrill, Lynch, Pierce, Fenner and Smith, Incorporated, and a partner of the predecessor partnership, in charge of the corporate buying department of the underwriting division. Merrill, Lynch is the largest brokerage firm in the country, the largest commodity firm, and one of the ten largest underwriting firms, with 126 offices in 108 cities. There were 71 partners prior to incorporation. The firm has 6,500 employees. It does 14.7% of the round-lot volume and 21.1% of the odd-lot volume on the New York Stock Exchange, and has between 325,000 and 350,000 active accounts. Lenz' firm was one of the managing underwriters of the Ford Motor Car secondaries.

He testified that, if the Government plan were put into effect, there would be a substantially adverse impact on the market price of General Motors common stock. Lenz' opinion was that, if the Government proposal were put into effect, General Motors stock would sell 20% to 30% below where it would otherwise sell, but without taking into account additional selling by holders of the existing 218,000,000 shares in the hands of the public, which he thought would be substantial. Lenz emphasized the problem of the selling which would be done by the existing holders of such shares. He pointed out that there were hundreds of thousands of such shareholders who would be very badly hurt, in his judgment, by the proposal if it were put into effect. He said his firm alone has on its books in its name for some 25,000 individuals 2,-

600,000 shares of General Motors and that, if the Government proposal were put into effect, the firm would have to inform the holders, would then be asked by them what they should do, and the firm would have to tell such holders that they should sell. Lenz also pointed out that, if 1% of the General Motors stock other than that owned by du Pont were sold, there would be another 2,000,000 shares on the market and, if 2% were sold, another 4,000,000 shares, and it would all be disorganized selling. Lenz testified that it would not be at all practicable to organize such stockholders for a single secondary offering as had been suggested by the Government witness, Dr. Friend. There were too many of them; such a secondary would be too expensive; and most of them would want to race into the market ahead of the others. Lenz said that the problem of selling by the existing General Motors shareholders may be the most difficult problem involved in the Government proposal.

Lenz thought that, if the plan were extended so that there was a 20-year period instead of a 10-year period, the impact on the same basis would be from 15% to 20%.

He was also asked to make an assumption that du Pont pay out the General Motors stock in lieu of its regular cash dividend. Lenz thought this would be worse and that the impact would be a decrease in market price of General Motors of between 25% and 35%. Lenz was asked what the effect would be if du Pont were required to make a single dividend of the General Motors stock. He thought that there would be many more sales of General Motors stock and a still greater depressing effect on the market.

Lenz thought that the Government plan would cause the sale of from 5,000,000 to 6,000,000 shares of du Pont. He said that, even if that amount were cut in half, it would still be difficult to dispose of such shares. He thought the market impact would be a decrease of around 25% to 30%. He could not see who would buy du Pont stock under such conditions, except for tax-free institutions and corporations which might buy at bargain prices.

Lenz estimated that the spread which the trustee for Christiana and Delaware would have to pay underwriters would be from $1.80 to $2 per share of General Motors, which would be a loss to Christiana and Delaware on top of the reduction in market price due to the Government proposal. Lenz said, if the trustee tried to make a sale and then withdrew it, it would be very difficult to revive buyer interest. It would appear that sales by the trustee would probably have to be registered with the Securities and Exchange Commission under the Securities Act of 1933. Lenz did not think there would be too much difference in selling, whether the offering were registered or not, except that there would be less flexibility if registered.[10]

Lenz agreed with Emerson that the trustee would never realize a price, in the words of the Government proposal, "sufficiently high to reflect the fair value and true worth of the stock."

Lenz also gave his opinion as to the effect of the Government plan in case a bill such as S. 200 passed and the du Pont Company made one distribution of the 63,000,000 shares of General Motors, but where the trustee still sold shares going to Christiana and Delaware in ten equal annual installments. He estimated a 10% to 15% decrease in market price.

Mr. James R. Forgan, a partner of Glore, Forgan and Company, an investment banking firm in New York and

10. After the record was closed, the Government put before the Court correspondence between the Antitrust Division and a member of the staff of the Securities and Exchange Commission regarding methods of sale by the trustee. The correspondence was fragmentary. There were indications that conversations in addition to the correspondence must have taken place. The correspondence should not be given serious consideration under such circumstances. However, as indicated above, registration is not a very important factor in appraising the situation.

Chicago, testified for General Motors. He is in charge of the operations of the New York office and has been in the business of marketing securities for nearly thirty years. He testified that, if the decree proposed by the Government were to be entered, the market for General Motors stock would be drastically depressed. He said that, in addition to the 2,000,000 shares a year to be sold by the trustee, another 1,000,000 or 1,500,000 shares a year would be sold by du Pont stockholders receiving General Motors stock and there would be further sales by existing General Motors stockholders.

Mr. Forgan testified there was no precedent for the situation which would be created by the Government proposal. He said it would be a unique situation in investment history. His opinion was that the trustee stock could only be sold under these conditions at a 30% discount from the existing market and that the stock would fall to that price immediately upon the Government plan becoming effective.

The defendants introduced the testimony of Mr. Ralph Lowell, President of The Boston Safe Deposit and Trust Company and a member of the Finance Committee of John Hancock Mutual Life Insurance Company. The Trust Company has 4,400 trust and agency accounts with over $1,187,000,000 of assets. These trusts hold 467,357 shares of General Motors and 89,100 shares of du Pont. The Trust Company has many small accounts.

Mr. Lowell testified that, in case the Government plan were put into effect, the Trust Company would sell the du Pont stock held in most personal trusts because the Massachusetts law would require a trustee to treat General Motors stock received as a dividend as income, whereas the Trust Company would consider the distribution as principal. He said the Trust Company would do the same thing in the case of charitable trusts for a similar reason. He said the Trust Company had taken such action in the case of stock dividends by the Standard Oil Company of New Jersey. He said that

extension of the period of the plan from 10 to 20 years would not change the action of the Trust Company.

On this phase of the case Mr. David M. Kennedy, Chairman of the Board of the Continental Illinois Bank and Trust Company of Chicago and Chairman of its Trust Investment Committee, testified that the Trust Company has been a net seller of du Pont stock from the date of the Supreme Court decision, June 4, 1957, to February 19, 1959, and that most of the selling was done since the announcement of the Government proposal. He said that the net sales amounted to 16,-715 shares. Mr. Kennedy also testified that there would be serious trust problems in connection with the receipt of General Motors stock as a dividend and this would case protracted litigation. He said the Trust Company had held in 635 trusts 105,855 shares of du Pont stock, with a market value, at $217 a share, of $22,970,535, and that the Company held 845,323 shares of General Motors common in 1,221 trusts, with a market value, at $46 per share, of $38,884,858.

Mr. Beacom, Vice President in charge of the Trust Department of the First National Bank of Chicago, also testified on this phase of the case. He testified that the Bank held in 1,822 trusts 853,650 shares of General Motors of a market value, at $46 per share, of $39,267,900. There were 133,490 shares of du Pont in 946 trusts with a total market value, at $230 a share, of $30,702,700. Mr. Beacom testified that the Government plan would adversely affect the value of both du Pont and General Motors stock. He emphasized that there would be no offset in demand against the additional supply which would go on the market. He thought there would be an avalanche of offerings of du Pont stock from trust institutions throughout the country. He said the Bank had come to the conclusion that the Government proposed decree would cost the accounts to which General Motors stock might be distributed as much as $10,000,000 to $12,000,000. Mr. Beacom also stressed the problems of allocation between principal and in-

come in the trusts of the General Motors stock received as a dividend.

In rebuttal the Government called Mr. George B. Rogers, a lawyer with the First National Bank of Chicago, to bring out that there had been allocations to trusts of dividends in stock of other companies without difficulty in the past. But the size of the distributions was small compared to the distribution proposed under the Government decree and this evidence does not detract from the testimony of Messrs. Lowell, Kennedy and Beacom to the effect that there would probably be allocation difficulties for trustees and litigation with beneficiaries if the Government decree were put into effect.

The defendants introduced the testimony of two men whose business was the investment of insurance company funds. Mr. Charles F. Caley, Jr., Assistant Treasurer of Aetna Life Insurance Company and affiliated companies, in charge of making the original recommendations on the companies' investments in common stocks, testified. The Aetna Life Insurance Company has assets of $3,550,000,-000, making it about seventh in the life insurance field. The affiliated companies have assets of $616,000,000, which make them fourth or fifth in the fire and casualty insurance business. The companies have about $240,000,000 in common stocks. They own 27,600 shares of du Pont and 50,205 shares of General Motors. Caley was of the opinion that the Government plan, if put into effect, would substantially lower the price of General Motors stock. He said his company would not buy in the early part of the 10-year period, except at "an absurdly low price." He said he did not know how far down the price of du Pont would go, and he would take the advice of investment bankers and brokers on that. Caley was asked what the situation would be if du Pont paid out the General Motors stock in lieu of cash dividends. He thought the investment problem of the accumulated cash would be difficult and could easily cause trouble for du Pont with the Department of Justice.

Mr. John V. Herd was the other insurance executive who testified. He is Chief Executive Officer of the America Fore Insurance Group and a director of the America Fore Loyalty Group, a total of twelve companies in the fire and casualty insurance business, with assets in excess of $1,500,000,000. Herd is also a director of American Telephone and Telegraph Company, the Dominick Fund, an investment company, and the Hanover Bank, a New York City bank with a large trust department. He is a member of the Trust Committee of the Bank. The America Fore Group have $820,000,-000 invested in common stocks which Herd said was by far the largest investment in common stocks under any one insurance company management. The companies held 249,500 shares of General Motors as of the year-end, with the then market value of $12,350,250. The corresponding holding of du Pont was 123,-300 shares, with a market value of $26,-355,375. Herd testified that if the Government plan were adopted the market value of General Motors stock would be depressed, and also that his company would sell some of its General Motors stock. Herd said that the Government plan would take the blue chip luster from the General Motors stock.

Another financial expert called by the defendants was Mr. William B. Moses, Jr., a trustee of Massachusetts Investors Trust and a director of Massachusetts Growth Stock Fund, who administers the investment research department of both funds. Massachusetts Investors Trust is the largest open-end investment company in the country, with approximately 200,000 shareholders and assets of $1,500,000,000, almost entirely in common stocks. The Growth Fund has assets of $250,000,000 invested in common stocks believed to have substantial prospects for growth development. The Growth Stock Fund has about 69,000 stockholders. Moses said that Massachusetts Investors Trust owns 700,000 shares of General Motors with a market value of approximately $32,000,000, and that it had 112,000 shares of du Pont,

with a value of about $25,000,000. He said the Growth Stock Fund held no General Motors, but had 17,000 shares of du Pont.

Moses held the view that the Government plan would depress the price of General Motors stock. He said he would recommend that the Massachusetts Investors Trust purchase additional General Motors in the price area of $35 or $40 a share, compared to the then current price of $46 per share. Moses thought the impact of sales by du Pont stockholders receiving General Motors shares would be greater than the impact of the trustee's sales. He thought the trustee would have to sell at a bargain level. Moses thought the Government plan would depress the price of du Pont stock, because stockholders would sell to avoid the tax, and that there would be very few wanting to buy the stock. He said he would recommend that his companies purchase du Pont if the price of the stock receded to about $160 a share, the price at the time of the hearing being about $230 a share.

Defendants called one economist not in the business of investing funds or marketing securities. He was Dr. Neil H. Jacoby, Dean of the Graduate School of Business Administration at the University of California. Dr. Jacoby served on the President's Council of Economic Advisors from 1953 to 1955. He was also American advisor to the Government of India, and the United States representative on the Economic and Social Council of the United Nations. Dr. Jacoby testified on the basis of the economic factors which he found to be relevant that the Government plan would reduce the value of du Pont stock. He said that, if du Pont paid out General Motors stock in lieu of cash dividends, the consequences would be even more severe. He also testified that such a policy might well create other serious problems as to the ability of du Pont to invest the accumulated cash profitably and legally. The resulting problem in his opinion would be not only that of the du Pont management but also a concern of Government officials charged with enforcing the antitrust laws.

Dr. Jacoby also testified that adoption of the Government plan would materially affect the value of General Motors stock because of the substantial increase in supply without any compensating increase in demand.

Dr. Jacoby did not attempt to assess the stock market reactions that might influence the market prices of du Pont and General Motors stock. He recognized that such factors might serve to accentuate the effects which purely economic factors would have on the value of du Pont and General Motors stock. He also emphasized that, if unfavorable economic conditions should occur during the period covered by the Government plan, the economic consequences of the Government plan could be appreciably greater. He noted that unfavorable conditions of the kind described above had occurred in the past 10 years.

Mr. Moses, of Massachusetts Investors Trust, testified that General Motors had raised $700,000,000 through new financing during the past ten years and that the prospect is that General Motors would need still more money during the next ten years. He said that the Government proposal would hamper General Motors in its effort to raise money through the sale of common stock.[11] Emerson expressed the opinion that it would be a very difficult operation for General Motors to finance through the issuance of common stock during the period the Government decree was in effect. Lenz testified that the Government plan would make financing by General Motors through sale of its stock highly uneconomic and very difficult of accomplishment. Forgan held the view that, if the Government plan were in effect, the price

---

11. Mr. Moses also held the view that a deterioration in the market price of General Motors stock would make it difficult for other automobile companies to do any equity financing, for their stock would have to compete with the price of General Motors stock at the time.

at which General Motors could do financing through the sale of common stock would be so low that the Company would be ill advised to use that form of financing. He would advise General Motors against such an operation. He doubted whether an underwriting group could be formed under such circumstances. Jacoby thought the plan would handicap General Motors in raising equity capital.

While there is no evidence that the Government proposal would make it difficult for General Motors to do debt financing, the Government's witness, Mr. Shanks, President of Prudential Life Insurance Company, testified that a company could not do continuous debt financing without doing some equity financing as well and that the Government plan would pretty well prevent General Motors from equity financing.

Inability of General Motors to do equity financing might have a serious adverse effect on General Motors raising the capital needed to maintain its position in the industry.

The foregoing are economic effects the risk of which cannot be ignored in considering the desirability of the forced distribution and forced sale features of the Government proposal.

 In considering the type of decree which should be entered, evidence should be considered as to any possible voting control of General Motors by corporations or individuals affiliated with du Pont which might result from the decree.

No testimony was introduced in the relief hearings on this branch of the case. Instead, tabulations of various stockholdings in Delaware, Christiana, du Pont and General Motors and of du Pont family relationships were introduced. Such other evidence as there is on the subject is contained in the record of the original trial.

The contentions of the Government regarding potential control of General Motors through the votes inhering in its common stock can most conveniently be discussed against the background of the du Pont plan. Under the du Pont plan the votes on the shares of General Motors stock owned by du Pont are passed through pro rata to the stockholders of du Pont, and the votes going to Christiana and Delaware are passed through successively to their ultimate stockholders. Although the du Pont plan does not provide for Christiana passing through the votes on the 535,500 shares of General Motors held by it, the discussion below assumes that such votes are passed through.

The contention of the Government is that the General Motors stock allocable to Christiana, Delaware and the stockholders of Delaware should be sold because otherwise it can be assumed that certain groups of stockholders of du Pont, Christiana and Delaware would act in concert in exercising the votes on General Motors stock passed through to them. In the Government's memorandum of September 26, 1958, the contention was that individuals who were stockholders of Delaware would control General Motors as a group by use of the votes they would receive from du Pont, from Christiana and from Delaware under the du Pont plan, when such votes were added to the votes on their directly owned General Motors shares. From the evidence adduced at the trial it appears that the vote on approximately 1.8% of General Motors stock would come in the aggregate to the stockholders of Delaware (other than charities) in the event of the pass through of the votes, including the vote on directly held General Motors stock. In addition, the personal foundations directly related to this group, namely, Longwood Foundation, Inc., and the Carpenter Foundation, Inc., would exercise voting rights on somewhat in excess of 1,000,000 shares of the General Motors stock. Adding the two together, the resulting votes would represent slightly over 2% of the outstanding General Motors stock.

In its brief of April 29, 1959, and accompanying proposed findings, the Government contends that additional individuals, each having the name du Pont

as some part of his name, should also be grouped with the stockholders of Delaware, and that certain corporations in which these individuals, and also stockholders of Delaware, own stock, or on whose boards they sit, should be placed in the group. The contention is that the votes which all these 65 persons now have and would receive on a pass-through would amount to about 8% of the total General Motors vote and that this is a controlling vote. There was no evidence adduced at the hearings as to the basis for the grouping other than statements of relationships, many of which are very remote, and statements of financial interests in companies such as the old 1899 du Pont Corporation.

To determine whether there is any basis for the groupings contended for by the Government, the genesis of the present-day stock interests of members of the "du Pont family" in du Pont, Christiana and Delaware, as shown by the record on the original trial, should be analyzed. The term "du Pont family," as now used by the Government, includes all lineal descendants (and their spouses) of Pierre S. du Pont de Nemours, a great-great-grandfather of the Pierre S. du Pont, who was a defendant in this case. However, as set forth in paragraph 7 of the amended complaint, the Government did not thereafter claim in the original trial a family grouping beyond the eight brothers and sisters of the defendant, Pierre S. du Pont, and their spouses and descendants.

It would seem to the Court that, regardless of whether there is basis for the latter grouping, the history of the Companies shows that there is no basis for combining in any group the remote relations consisting of the people first described, i. e., descendants of Pierre S. du Pont de Nemours, merely by reason of such descent, or persons simply because they had a financial interest in the old du Pont Company of 1899.

The relevant history starts in 1899 when the du Pont enterprise was first incorporated. The stockholders were individuals with the name du Pont although not in the families of the defendant Pierre S. du Pont or his eight brothers and sisters.

In 1902 the assets of the 1899 Corporation were sold out and were acquired by three cousins, two of whom had not theretofore been interested in the business, T. Coleman du Pont and Pierre S. du Pont, the new investors, and Alfred I. du Pont. These men formed a new corporation to which the business was transferred. The bulk of the stock, 72%, was acquired 36% by T. Coleman du Pont, 18% by Pierre S. du Pont, and 18% by Alfred I. du Pont. Following this sellout of the 1899 Company there was no basis for grouping its stockholders with defendant Pierre S. du Pont or his brothers and sisters, except for T. Coleman du Pont and Alfred I. du Pont.

This situation broke up in 1915 when the defendant, Pierre S. du Pont, and some of his brothers and brothers-in-law and certain associates formed another corporation which acquired the stock of T. Coleman du Pont. This corporation was the predecessor of Christiana. Substantially all of the du Pont stock now held by Christiana, about 27%, traces back to this transaction. Pierre S. du Pont, with his brothers and brothers-in-law, held a substantial majority of the stock of Christiana.

Following this transaction, which eliminated T. Coleman du Pont from the situation, there was a protracted and bitter litigation between the defendant, Pierre S. du Pont, and his cousin, Alfred I. du Pont. The defendant Pierre ultimately won out and Alfred I. du Pont then retired from any active participation in the affairs of the du Pont Company. Consequently, the Court is of the opinion that there is no basis for grouping relatives of Alfred I. du Pont or T. Coleman du Pont with the defendant Pierre S. du Pont and his brothers and sisters and their families.

The origin of Delaware traces to a transaction in 1924 in which the defendant Pierre S. du Pont conveyed to Delaware a substantial portion of his holdings in Christiana and du Pont and in con-

sideration therefor received a substantial annuity for himself and his wife. The stock of Delaware was initially purchased in eight equal blocks by the families of his eight brothers and sisters. All of the Christiana and du Pont stock now held by Delaware was acquired in this transaction. As a result of this transaction and subsequent transactions, the stock of Christiana which was initially held in most part by defendant Pierre S. du Pont and the families of his brothers and sisters is now held as follows: 49,000 shares, about one-third, by Delaware, 24,453 shares by individuals who are stockholders of Delaware, and the balance by approximately 4,000 stockholders. This Christiana stock is actively traded in the over-the-counter market. Delaware holds, in addition to the 49,-000 shares of Christiana common, 1,217,-920 shares of du Pont common. The Delaware stock is, generally speaking, still held by the families of the brothers and sisters of the defendant Pierre S. du Pont—some 140 persons.

Substantial amounts of this Delaware and Christiana stock are not held directly in these families, but are in trusts for them at the Wilmington Trust Company. The Wilmington Trust Company has close ties with many members of these families through their holdings of Wilmington Trust Company stock and through their creation of these trusts in the Trust Company.

A majority of the officers and directors of both Christiana and Delaware come from such families and many of them are officers and directors of du Pont.

Counsel for Christiana and Delaware contend that there is no justification for assuming that the families of the brothers and sisters of defendant Pierre S. du Pont (who comprise the stockholders of Delaware and some additional individuals) and the Wilmington Trust Company would act in concert to vote their General Motors stock. They point to the fact that an analogous claim was made and disproved as to many of these same people in this case. It was charged that some of these people, through ownership of approximately 17% of the voting stock of U. S. Rubber, influenced the trade relations between du Pont, General Motors and U. S. Rubber, and that charge was disproved.

A corollary question on this branch of the case is whether, even if these people acted in concert, they would have sufficient voting rights under the "pass-through" of the du Pont plan to exercise any real control over General Motors. As set forth above, the stockholders of Delaware, other than public charities, would have a total of slightly in excess of 2% of the total General Motors votes. The tabulations now in evidence show that additional members of the eight families who are not direct or beneficial stockholders of Delaware would have an additional 1,263,806 votes, not including votes connected with trusts at Wilmington Trust Company. If these votes were combined with the votes of Delaware stockholders, the total would be about 2.5% of the General Motors total. Even if there were added in the additional votes which the Wilmington Trust Company would have from various sources, 9,513,311 (or 3.4%), the total per cent would increase to only about 5.9%. It seems doubtful that this is a sufficiently large number of votes to exercise any real control over General Motors.

However, the Court does not deem it necessary to decide this question because, as will be shown hereafter, it intends to direct a form of decree which will obviate the determination of the two questions whether these people would act in concert and whether, if they did, they would have control or influence.

The proposed Government decree (as supplemented by the Assistant Attorney General's letter to the Internal Revenue Service, dated March 13, 1958 (Amicus Dallstream Exhibit 2)) provides that the trustee for shares of General Motors stock distributed as dividends to Christiana and Delaware by du Pont, before selling the shares in the market, shall give fifteen-day options or rights to purchase such shares to other stockholders of du Pont. There is no specification re-

garding the price at which the shares may be purchased under such option or rights. It would seem that the price would have to be the market price in order that there be no unjustified taking of property from Christiana and Delaware and giving it to other stockholders of du Pont. But, if it is the market price, there would be no incentive to such other stockholders to purchase the shares since they receive many such shares as dividends and know that the trustee must make a general offering of General Motors shares and that the market price will be further depressed. Accordingly, it appears to the Court that the provision is without substance. It is apparently inserted to give the appearance that the offering by the trustee is similar to a rights offering by a corporation to its own stockholders. There is no such similarity.

The Government decree also provides that such trustee may in his discretion accelerate the time schedule for the sale of shares of General Motors allocable to Christiana, Delaware and the stockholders of Delaware by selling more than one-tenth in any one year. However, the trustee will not hold any stock for the accounts of these persons until the dividend is declared each year and paid to all stockholders of du Pont. Accordingly, there is no way he can accelerate the time schedule. The provision was apparently inserted to indicate that the trustee would have additional flexibility in making the sales, but it is meaningless.

Apparently also to indicate that the trustee would have flexibility in making sales of General Motors shares, the Government proposed decree provides:

"If, in the judgment of the trustee, reasonable market conditions do not prevail over an appreciable and adequate portion of this one-year period, the trustee may petition the Court for an order extending this time for such additional part of the 10-year period as the Court may direct. In addition to such other circumstances as may be relevant, rea-sonable market conditions shall not be deemed to exist if the price which can be realized at the time by the trustee is not sufficiently high to reflect the fair value and true worth of the stock."

However, it was testified that the trustee could never realize during the ten-year period a price sufficiently high to reflect the fair value and true worth of the stock. Accordingly, this provision would make the Government proposed decree a virtual nullity unless the intent is that, at the end of the ten-year period, the trustee shall dump all of the approximately 20 million shares of General Motors then belonging to Christiana, Delaware and the stockholders of Delaware on the market at any price. The latter would not be a sensible proposal. However, the provision does indicate that the Government concedes that these shareholders of du Pont should not be penalized and should receive the fair value and true worth of the General Motors stock. The mechanics of accomplishing this desirable objective are simply faulty.

The provision for a trustee appointed by the Court and acting as a Court Officer to handle the marketing of 20,000,000 shares of stock over a ten-year period having a present value of approximately $1,000,000,000, seems to the Court to be singularly inappropriate. According to the Government witness Boni, who was called as an expert, the Court should lay out a program for its trustee. The trustee would have to exercise discretion about when to sell the stock. Boni then conceded that the trustee might have to call in underwriters to make a secondary offering, with whom the trustee would have to make a contract. The trustee would undoubtedly seek the advice of the Court in order to share his great responsibility. This Court does not believe that any court should be called upon to exercise such a function in the case of stock transactions of such complexity and magnitude.

The problems that arise with respect to the nature of the relief that should be granted fall into two categories: First,

there is the question of what provision the judgment should make with respect to the 63,000,000 shares of General Motors stock owned by du Pont. Second, there is the question of what provisions the judgment should contain by way of injunctive relief in addition to the provisions that deal with the stock. The Court will deal with these problems separately.

In view of the Court's decision, the General Motors stock owned by du Pont should be considered in two categories:

1. The stock allocable to all stockholders of du Pont other than Christiana and Delaware—approximately 43,000,000 shares.

2. The stock allocable to Christiana and Delaware—approximately 20,000,000 shares.

The Court has held earlier in this opinion that no relief can be granted against the shareholders of Delaware who are also shareholders of du Pont because they are indispensable parties and are not before the Court. Accordingly, no separate discussion of the shares of General Motors allocable to this group of stockholders of du Pont is necessary.

Considering first the shares of stock of General Motors allocable to the stockholders of du Pont other than Christiana and Delaware, the Court has no doubt that the voting rights of these shares should be divested. The Court is of the opinion that this divestiture should be accomplished by passing through the vote on these shares to the stockholders of du Pont. The parties are in virtual agreement that this measure of relief is desirable and practical. The Government plan proposes this kind of divestiture of the voting rights pending the distribution and sale of the stock provided for by that plan. The plans submitted by du Pont and the amici also provide for divestiture of the voting rights.

Therefore, the final judgment should provide for this divestiture and should require both du Pont and General Motors to take whatever steps may be required to make the pass-through of the vote effective. The judgment should provide that the Court appoint a monitor whose duty it will be to supervise the effectiveness of the voting provisions of the judgment and to report to the Court. In this connection the judgment should also provide that the passed-through vote should not be exercised on any shares allocable to anyone who is an officer or director of the du Pont Company, since to do so would be inconsistent with the purposes of this divestiture. This limitation should extend as well to the members of the family of any such officer or director residing in the same household with him. In addition, the final judgment should also prohibit this same group from voting any other General Motors shares. These provisions taken together will assure that no officer or director of du Pont will be in any position to exercise a vote with respect to General Motors shares. They are in substantial accordance with the proposal made in the plan submitted by the amici. Divestiture of the voting rights on the General Motors shares should be effective as long as du Pont continues to hold legal title to those shares.

It is also the opinion of the Court that the judgment should divest the General Motors stock owned by du Pont of any right to representation on the Board of General Motors. To this end the judgment should enjoin both du Pont and General Motors from having any common officers and directors or employees in substantially the form requested by the Government. Du Pont has proposed a form of judgment which would permit the Court to sanction interlocking directorates between the two companies, provided that the common directors did not participate in any discussions or decisions on the Board of General Motors relating to its commercial relations with du Pont. In the Court's opinion such a provision in the judgment would not be appropriate. The separation between the two Boards should be complete and should be accomplished by the resignation from the one Board or the other of any existing common directors within a reasonable time after the entry of the

judgment, that time to be fixed by the terms of the judgment itself.

This leaves for consideration the question of whether the judgment should also provide for the divestiture of du Pont's legal title to the General Motors stock, either in accordance with the plan proposed by the Government, some modification of that plan, or by some other method. With the voting rights of the stock divested, and with its right to representation on the Board of General Motors also divested, as provided for above, the possession of the legal title by du Pont will leave du Pont with the right

1) to receive dividends on the stock,

2) to share pro rata with other stockholders in the assets of General Motors in the event of liquidation,

3) to dispose of the legal title.

In this connection it should be noted that it is not disputed that for many years du Pont has passed on to its stockholders as dividends the amount of the dividends that it has received from General Motors less the amount of the intercorporate dividend tax. There is no suggestion that du Pont intends to modify or abandon this practice. On the contrary, the testimony of the Treasurer of the du Pont Company shows that its financial projections for the future have been made on the assumption that this practice will continue. This discussion of the question of the right to receive dividends leads the Court to the conclusion that as a practical matter retention of the bare legal title to the stock by du Pont will leave it simply with the right to share pro rata in the assets of General Motors and the right to dispose of that legal title. Neither of these attributes of ownership would appear to raise any problem in the context of this case. Should a situation arise where either of these attributes took on significance it appears likely that the only action du Pont could take by reason of such attributes of ownership would encourage the enforcement of the antitrust laws

and assist in carrying out the mandate of the Supreme Court.

The question then is whether with the legal title stripped of all of the incidents of ownership except those heretofore mentioned, the Court should also require divestiture of that legal title. The Court has heretofore held that it is not required, as a matter of law, to divest the bare legal title unless it finds on the facts that divestiture is required to eliminate the effects of the acquisition of the stock found to be offensive to the statute. The question is, therefore, whether the Court can find that in this case it is necessary to divest the bare legal title in order to remove and to guard against the probability of restraint or monopolization of trade which was the consequence the Supreme Court found to be offensive to the statute.

There is no evidence on which the Court could make such a finding. The Government did not offer any evidence that bears on this question, its principal reliance being on the legal argument that the Court is required, as a matter of law, to order divestiture of the legal title irrespective of whether that kind of divestiture was required in fact to guard against the unlawful consequence of the acquisition.[12] If the General Motors stock is stripped of its voting rights and of its right to representation on the Board of General Motors, as provided for above, no incidents or attributes of ownership are left with du Pont which could be used to influence the practices and policies of General Motors. General Motors would have no motive in these circumstances, arising either from fear of the exercise of the voting rights or resulting from the presence on its Board or on the committees of its Board of du Pont representatives or resulting from considerations of self-interest, to favor du Pont. It is well recognized that the normal and indeed the only way in which the holder of a substantial block of stock can influence the practices and the poli-

---

12. Certain related contentions made by the Government as to the significance of the evidence it offered with respect to du Pont's trade relations with General Motors are discussed hereafter.

cies of the corporation is through the exercise or threatened exercise of voting rights or by representation on the Board of Directors. The Court is reinforced in this view by the fact that in the trial in chief and before the Supreme Court the Government relied primarily upon du Pont's voting rights and upon the participation of its representatives in the affairs of the Board of Directors of General Motors as the avenues and means which had been used or could be used by du Pont to influence the conduct of General Motors.

The Court has carefully considered whether it might be thought that if the voting rights of the General Motors stock should be distributed to the more than 200,000 shareholders of du Pont there is any reasonable possibility that those shareholders or any part of them (excluding from consideration Christiana and Delaware, which will be dealt with separately) could by voting cohesively or, as a group, influence General Motors to favor du Pont. The Government has made no showing that any such possibility exists and there is no basis in the record on which the Court could assume that anything of the kind could happen. The number of stockholders, the diversity of their interests and the unlikelihood that General Motors trade policies could be influenced by actions taken at stockholders' meetings militates against any such possibility. In addition the Court proposes, in a manner that will be stated hereafter, to provide by appropriate injunctive provisions against the remote possibility that the numerous stockholders of du Pont would nominate or elect a representative on the General Motors Board.

In essence, therefore, what would be left in du Pont would be the most sterile kind of an investment. The Court notes in this connection that Section 7 of the Clayton Act expressly excludes from its operation "corporations purchasing such stock solely for investment and not using the same by voting or otherwise" to bring about anti-competitive effects. There would thus appear to be a recog-

nition on the part of Congress that the holding of stock does not in all instances carry with it the power to bring about consequences offensive to the statute. The Court recognizes that the Supreme Court has held that in the past du Pont has not held its stock in General Motors solely for investment. This Court is of the opinion, however, that the divestiture and ancillary injunctive provisions referred to hereafter will be effective to assure that hereafter General Motors stock will be held by du Pont solely for investment.

The Court has given no consideration to the question of whether the continued holding of General Motors shares under the conditions outlined above would be an attractive investment for du Pont. It goes without saying that a holding of a substantial investment of common stock, with the limitations and restrictions on such ownership to be imposed by the Court, is unusual. Du Pont will have no vote on the General Motors shares. It cannot have any representation on the General Motors Board. It passes through the dividends, minus the dividend tax, to its stockholders. Under these circumstances it is possible that the du Pont management would be motivated to dispose of the investment, or parts of it, from time to time when suitable occasions might arise. There would be nothing in the decree to prevent such dispositions.

In the circumstances, therefore, the Court finds that there is nothing in the record made in the hearing on relief or in the record in the trial in chief which would support, even by inference, the conclusion that du Pont's possession of the bare legal title to General Motors stock, stripped of its right to vote and of its right to representation on the Board of General Motors, would create any possibility that the stock would have any influence on the practices and policies of General Motors or could be used in any way that would be inconsistent with the mandate of the Supreme Court.

The question remains whether divestiture should be ordered even though it is

not necessary in order to prevent the consequences condemned by the statute. It is in relation to this point that the Court is required to consider what the consequences of divestiture of the legal title would be to the shareholders of both du Pont and General Motors. On the record there can be no doubt that divestiture of the legal title would have serious adverse consequences to these stockholders. If the Government plan were to be adopted and the General Motors stock should be distributed by du Pont in addition to its usual cash dividends, the tax consequences would be extraordinarily severe and as explained above would in effect amount to a capital levy on the market value of the General Motors stock ranging in amount from 20% to 91%, and averaging perhaps 50–60% (less the dividends received credit), depending upon the tax brackets of individual stockholders.

That kind of distribution would also have adverse consequences on the market value of both General Motors and du Pont stock. The extent of those consequences is in dispute. This is a matter that cannot be measured with any degree of certainty. But the record satisfies the Court that there would be adverse consequences and that they would be substantial. Although much of the evidence offered by both sides was concerned with measuring the adverse consequences of the Government's proposed divestiture of legal title, there is no need for the Court to resolve the conflict in the evidence as to how severe those consequences would be. The Court is persuaded beyond any doubt that a judgment of the kind proposed by the Government would have very serious adverse consequences. In the circumstances, the Government is asking the Court to speculate with the property of innocent parties. It would be unreasonable and unjust for the Court to adopt measures which are certain to result in losses to innocent stockholders when the effects offensive to the statute can be eliminated by measures which will not result in such consequences. If the provisions of the decree, as outlined in this memorandum, should prove in the future to be inadequate to curb the violation, the door of the Court is open to the Government to petition for a modification of the judgment at any time.

If du Pont should discontinue completely its normal cash dividend and pay dividends entirely in the stock of General Motors for the ten year period required by the Government plan, these tax consequences would be mitigated. But, in these circumstances, the effect on the market value of General Motors stock would certainly be greater, since many more du Pont stockholders would doubtless be forced to sell in order to raise cash to pay taxes.

■ There is another point that deserves consideration in this connection. If du Pont should adopt this policy it seems certain that in the ten years involved the Company would accumulate an extraordinarily large amount of cash in excess of its needs for the normal development of its chemical business. In fact, the projections of the Company, which were the subject of testimony of its Treasurer and were not attacked by the Government, indicated that du Pont would accumulate an amount of approximately $2,500,000,000 or $3,000,000,000 in excess of its needs for anticipated growth. Assuming that du Pont could find useful employment for this amount of capital it seems clear that the result would be to increase enormously the power and economic position of the du Pont Company. Although the Court is aware that legally size alone does not violate the antitrust laws, the Court is of the opinion that in formulating an antitrust judgment it should not use its equitable powers in a way that seems certain to enhance the power and position of the du Pont Company and perhaps create new antitrust problems for both the Company and the Department of Justice in the future.

The Court has considered whether there might be modifications of the Government's plan or other forms of divestiture of the legal title which might reduce or mitigate these adverse conse-

quences. The modifications of the Government's plan which were discussed in the hearing would not, in the opinion of the Court, remove these adverse consequences although they might mitigate their severity to some extent. For example, if the Government plan or any comparable arrangement should be adopted, the Court is satisfied that a longer period than ten years should be allowed for its execution. In its reply memorandum, the Government itself suggested that a period as long as twenty years might be appropriate. In this connection, the Court finds it significant that in the Aluminum case the United States District Court for the Southern District of New York allowed a ten year period for divestiture in a situation in which the problems of divestiture were less complicated and the dollar value of the property involved was substantially smaller than is the case here. Alternative methods were not suggested by any of the parties. The Court does not believe that there is any method of divesting legal title to the General Motors stock now held by du Pont which would not either impair the value of the property interests involved or impose severe tax consequences upon the stockholders of the du Pont Company.

Because divestiture of the legal title is not necessary to remove the consequences of the acquisition found to be offensive to the statute, the Court concludes that it would be unfair and repugnant to the principles of equity to impose injurious consequences upon the stockholders of du Pont and General Motors by requiring the divestiture of the legal title.

Two types of injunctive provisions appear to the Court as necessary in order to assure the effectiveness of the divestiture which the Court proposes to direct and to provide additional means of eliminating the effects offensive to the Clayton Act.

 Certain of such injunctive provisions are in a sense ancillary to the divestiture order. As indicated above, du Pont and General Motors should have no common officers, directors or employees. Du Pont should be prohibited from acquiring any additional stock in General Motors substantially in the terms contemplated by Paragraph VIII of the Government's proposed judgment, except that it would seem fair to the stockholders of du Pont and in keeping with the investment character of du Pont's continued holding of General Motors shares to permit du Pont to retain such General Motors shares as it receives by virtue of stock dividends or in the exercise of rights extended with respect to its present holdings. The voting rights on any General Motors shares so received by du Pont should be subject to the pass-through in the same manner as the 63,-000,000 shares presently held by du Pont. The amici curiae have suggested injunctive provisions which would prevent du Pont from bringing to bear influence on General Motors in any fashion either by nominating directors or by soliciting votes with respect to any General Motors matters. Such provisions are desirable and should be included in the final judgment. Furthermore, the judgment should provide that the voting rights of the General Motors shares which are to be passed through to the stockholders of du Pont may not be voted at any General Motors annual or special meeting in favor of any persons nominated, designated or held out in any way to be a representative of the du Pont Company or of its interests. Necessary provisions to this end directed to both du Pont and General Motors should therefore be included in the judgment.

 The second group of injunctive provisions to be considered relate directly to trade between du Pont and General Motors. Du Pont has taken the position that such provisions are unnecessary and perhaps improper in framing a decree to cure a violation of Section 7 of the Clayton Act. As the Court has indicated earlier in this opinion its powers under Section 15 of the Clayton Act are exceedingly broad and extend to any activity or relationship which the Court believes must be affected in order to prevent or

restrain violations of the Act. Accordingly, the Court specifically rejects the contention made by du Pont with respect to the appropriateness of injunctive provisions relating to trade between du Pont and General Motors.

In view of the fact that the Supreme Court found only a probability that du Pont's stock interest in General Motors was likely to result in a restraint of General Motors purchases of automotive fabrics and finishes, the Court is not satisfied that injunctive provisions relating to trade of the character and scope proposed by the Government are necessary. It believes, however, that in the circumstances they are appropriate and may well contribute to an elimination of the consequence offensive to the statute in accordance with the mandate of the Supreme Court.[13] Accordingly, provisions substantially along the lines of those suggested in Paragraph IX of the Government's proposed judgment should be incorporated in the final judgment. Such provisions will require termination of any requirements contracts, exclusive patent arrangements or arrangements relating to preferential use of discoveries which may exist between du Pont and General Motors. They will also prevent General Motors and du Pont from embarking upon joint commercial ventures. On the whole, such provisions should remain effective so long as du Pont holds any stock in General Motors, except that a period of three years after the effective date of the judgment should be sufficient insofar as the ban against requirements contracts is concerned. A ban of any longer duration would appear to be an unwarranted and unnecessary interference with General Motors right to purchase from its suppliers, including du Pont, on such terms and conditions as it is able to secure. Following the expiration of this three-year period, the parties should be permitted to enter into such requirements contracts as they desire, provided that no such contract may extend over a period longer than a single calendar or automobile model year.

At the hearing the Government sought to present in evidence a substantial number of documents reflecting efforts on the part of du Pont to sell various products to General Motors, to other automotive manufacturers and to suppliers to the automotive industry. Counsel for the Government conceded that the evidence they were offering reflected no restrictive or improper conduct. They further conceded that they were not attempting to show a violation of Section 7 with respect to any products other than automotive fabrics and finishes—the products covered by the Supreme Court's holding. The evidence, it appears, was offered on the ground that it was appropriate in a hearing on relief to consider the whole area of present and future trade relations. The Court agrees with this statement and believes that the injunctive provisions referred to above evidence a recognition of both present and future areas of trade relations between du Pont and General Motors.

The Court excluded certain of the documents offered by the Government bearing on trade between du Pont and General Motors. These documents were presented as an offer of proof and submitted along with the record. The Court has had an opportunity to examine all of them. None of them suggests the slightest impropriety in du Pont's conduct of its trade relations with General Motors and other automotive manufacturers. As indicated above, the Court does not understand that the Government makes any such contention. Government counsel, in connection with the offer of these exhibits, suggested the possibility that if du Pont retained a financial stake in General Motors, even on behalf of its stockholders, du Pont would favor General Motors over other automotive manufacturers whenever du Pont developed new

---

13. Although the Government asks for the termination of "existing" requirements contracts and preferential trade agreements of various kinds, there is no evidence that any agreements of this character are presently in effect between du Pont and General Motors or have been in effect for many years.

products useful in the automotive industry. The Court finds no support for this suggestion either in the evidence taken at the trial in chief or in the evidence received or offered at the hearing on relief. Nevertheless, the Court will direct that the injunctive provisions in the final judgment relating to trade prohibit du Pont from giving General Motors preferential access to any of its products or from selling to General Motors on terms more favorable than those made available to competitors of General Motors so long as du Pont owns any stock in General Motors.

Since du Pont is to retain the legal title to the General Motors shares owned by it there is no occasion to consider a sale of those shares that would be allocable to Christiana and Delaware in the event a divestment of the legal title to the shares were to be directed. The Court observes, however, that the sale contemplated by the Government's proposed judgment would have serious tax and economic consequences to the shareholders of both of these companies, which include many religious, charitable and educational organizations. Moreover, the record discloses that sales of the magnitude contemplated by the Government's proposed judgment would in all probability disrupt the market for General Motors stock and cause serious harm to the stockholders of that company. For these reasons the Court would not be constrained to order such sales unless it were satisfied that they were the only means of formulating a decree that would carry out the mandate of the Supreme Court.

There remains for consideration, however, whether the final judgment should contain any special provisions with respect to Christiana and Delaware. The Court is satisfied that because of their substantial stock interest in du Pont, and because of the long-standing close relationship between these two companies and the management of du Pont, injunctive provisions substantially similar to those that will be entered against du Pont should be directed to Christiana and Delaware to guard against any possibility that they might acquire stock in General Motors or attempt in any way to influence or control General Motors. Inasmuch as neither Christiana nor Delaware is engaged in industrial operations there appears to be no occasion to extend to them the injunctive provision which will operate on the trade relations between du Pont and General Motors.

Du Pont, Christiana and Delaware have suggested that the latter two companies should not be permitted to vote any of the 63,000,000 shares of General Motors which they otherwise would be entitled to vote as stockholders of du Pont. Their proposal is that the vote be passed through in turn to the stockholders of Christiana and the stockholders of Delaware. If du Pont were to pass through to its stockholders the vote on the 63,000,000 General Motors shares which it owns Christiana would be entitled to vote approximately 16,805,684 shares of General Motors, and Delaware would be entitled to vote approximately 1,677,813 shares. Together Christiana and Delaware would be entitled to vote approximately 6½% of the outstanding General Motors common stock. The Government has contended that this number of shares should not be left in the hands of these two companies or distributed to their shareholders. The basis of this contention is that all of this stock, notwithstanding that it would be voted in varying amounts by some 4,000 shareholders of Christiana and some 200 shareholders of Delaware, would be voted as a block. In addition the Government asserts that some of these same shareholders own or would be able to vote additional amounts of General Motors stock so that as much as 8% of the outstanding General Motors stock would be voted as a block by people who have a substantial common stock interest in the du Pont Company. The Government further contends that such a block would constitute control of General Motors. Although the Government has made these contentions in support of its proposal to

sell the General Motors stock that would be distributed to Christiana and Delaware under its proposal, it is reasonable to believe that the same contentions would be made against the efficacy of any proposal to pass through the vote on the General Motors shares owned by du Pont and allocable to Christiana and Delaware.

The Government has failed to establish by credible evidence either of the premises upon which the foregoing contentions rests. The Court is not persuaded that the General Motors shares allocable to Christiana and Delaware would be voted by their shareholders as a block. Nor is it persuaded that even if they were voted as a block they would pose any real threat that General Motors purchasing policy could be directed in a way that would favor du Pont. The Government at the hearing on relief made no effort to establish these propositions except to introduce elaborate and detailed schedules disclosing the manner in which the stock of Christiana and Delaware and du Pont was held by various stockholders of Christiana and Delaware. The Court accepts these schedules as proof that the shares are held as indicated therein. It does not believe, however, that the schedules even suggest that the owners of the stock would all vote their allocable General Motors shares in a block. No effort was made by the Government to show how even 8% of the stockholders of General Motors would go about influencing the management of that company to favor du Pont in its purchases.

This is a relief proceeding, however, and it is perhaps not incumbent upon the Government to provide the evidentiary basis for its apprehensions in the same detail as would be necessary to establish a violation of the law. The Court has determined therefore to reject the proposal that the vote be passed through to the stockholders of Christiana and Delaware and instead proposes to include provisions in the final judgment that will preclude Christiana and Delaware from voting their allocable portion of du Pont's 63,000,000 shares of General Motors. These shares will be sterilized and voted by no one, with the result that the 18,483,497 shares of General Motors stock allocable to Christiana and Delaware will not be voted at any General Motors annual or special meeting.

In view of the fact that Christiana and Delaware are to be precluded from voting any of their shares of General Motors stock it seems appropriate that their officers and directors, as well as the members of their immediate families living in their households, should be similarly precluded. Accordingly, as in the case of the officers and directors of du Pont, the final judgment will preclude any person from exercising the pass-through vote or from voting any General Motors stock, who is at the time of any annual or special meeting of General Motors an officer or director of Christiana or Delaware or a member of the immediate family of such officer or director and living in his household.

In this connection it should be noted that while under the Government plan 19,670,115 shares of General Motors stock would be sold and therefore the votes eliminated, nevertheless, the vote on 7,739,467 shares of General Motors stock, or 2.8%, would still be left at the end of the 10-year period with the very groups to which the Government has pointed. Indeed, at the beginning of the 10-year period the vote on 10,860,111 shares, or 3.9%, would be in such groups. In contrast, under the provisions of the judgment referred to above, the votes with respect to more than 20,000,000 shares of General Motors stock would be sterilized [14] and there would be left with the entire group as to which the Government has raised questions somewhat less than the 2.8% which would be left with them under the Government's

14. The Court, in proposing to preclude the officers and directors of du Pont, Christiana and Delaware from voting the General Motors shares which they presently hold, is actually sterilizing a substantial number of shares of General Motors stock which could be voted under the Government's proposal.

plan. Furthermore, well over half of such votes would be voted by the descendants of the owners of the 1899 Company, including the Delaware Trust Company, who in the Court's view have only a very remote relationship to the matters involved in this litigation.

It would seem inappropriate to permit Christiana to continue to vote the 535,500 shares of General Motors stock which it owns and preclude it from voting any part of the 63,000,000 shares owned by du Pont. The Court is not entirely satisfied, however, that it is within its authority to affect Christiana's ownership of these 535,500 shares in any way since it has not been alleged by the Government that such shares were acquired or are held in violation of Section 7, and there is no basis in the record on which the Court could properly conclude that such shares have been so acquired or so held. The Court believes, however, that a sterilization of these shares would be appropriate and directs that such a provision be included in the final judgment unless Christiana wishes to present reasons why the provision should not be included. In that event the Court will give further consideration to the matter.

The Court has given careful consideration to the objections which the Government in its Reply Brief has made to any judgment which would fail to divest du Pont of the legal title to the General Motors stock and would leave du Pont with any financial interest in General Motors. The Government objects to such a judgment, first, because it "will permit a continuance of concentrated voting power of du Pont in General Motors by reason of the voting rights which would be acquired by the stockholders of Christiana, Delaware and the du Pont family." (Government Reply Brief, p. 12). The Government's second objection to such a judgment is that the "common financial interest between the defendants will continue to influence the commercial relations between du Pont and General Motors." (Government Reply Brief, p. 15).

The Court believes that the first of these objections is completely met by the provisions which the Court intends to include in the final judgment which will (1) sterilize all of the General Motors stock which, under the du Pont plan, would be voted by the stockholders of Christiana and Delaware, and (2) preclude the officers and directors of du Pont, Christiana and Delaware from exercising the voting rights on any General Motors stock, whether such stock is held directly or by the du Pont Company. These provisions will in fact do more to eliminate whatever "concentrated voting power" the stockholders of du Pont might have in General Motors than would be accomplished by the Government's plan itself. Insofar as voting power in General Motors is concerned, sterilization of the General Motors stock owned by, and allocable to, Christiana and Delaware will be just as effective as the sale of that stock in accordance with the Government's proposal. Moreover, while the Government's proposal would permit the officers and directors of du Pont and the members of their family to continue to vote any General Motors stock which they presently own and to exercise the voting rights of the General Motors stock they might receive in a distribution by du Pont, the Court proposes to enter a judgment which will preclude these persons from voting any General Motors stock.[15] In this connection, it is the Court's belief that the voting restrictions it proposes to impose upon the officers and directors of du Pont, Christiana and Delaware will be more effective than the prohibitions which the Government would impose upon persons who are shareholders of Delaware. It is the officers and directors of du Pont, Christiana and Delaware who would be likely to

---

15. Presumably the Government's plan would operate on some portion of this stock, i. e., that which is held by shareholders of Delaware who are also shareholders and officers or directors of du Pont. As the Court has found, however, it is without jurisdiction to order the relief proposed by the Government against the stockholders of Delaware.

perpetuate any common control of du Pont and General Motors and they are the persons who should be precluded from voting General Motors stock. For the foregoing reasons the Court has concluded that the Government's first objection to a judgment that would leave the du Pont Company with a financial interest in General Motors has no application to the judgment which the Court proposes to enter, because that judgment will include safeguards against the continuance of any "concentrated voting power" in General Motors that will be more effective than the Government's own proposal.

With respect to the Government's second contention, there is no rational basis on which the Court could find that such common financial interest as will exist between du Pont and General Motors under the judgment proposed by the Court can be expected to influence the commercial relationships between the two companies in any way. In the first place, the judgment will contain stringent injunctions against du Pont and General Motors dealing with each other on a noncompetitive or preferential basis. In this respect, the restrictions are more drastic than those proposed by the Government. The Court has no reason to believe that these restrictions will not be observed by the parties, and has every reason to expect that any failure to observe them will be brought to the Court's attention. In many instances where the antitrust laws have been violated, injunctive provisions of the kind which the Court proposes to enter are the sole remedies against further violations. On the whole, these remedies appear to have been effective and there is no reason to believe they will not be similarly effective in this case.

In the second place, nothing in the record supports the view that in the particular circumstances of this case, du Pont's ownership of a bare legal title to the stock, unaccompanied by any voting rights or by any representation on the Board of General Motors, would or could have any effect on the commercial practices of General Motors. If General Motors were to have a continuing financial interest in du Pont rather than vice versa, the Court can appreciate that there might remain some incentive for General Motors to buy from du Pont in order to increase the latter's sales and profits. In that case, the owner of the financial interest would be making the buying decision and might be influenced to purchase from a company in which it held a substantial financial interest. In this case, however, the buying decision must be made by General Motors. It has no financial interest in du Pont and the Court is aware of no incentive which would operate to influence a General Motors employee to favor du Pont in any way.

The Court recognizes the force of the Government's argument that the Supreme Court's decision was not necessarily confined to the voting power which du Pont enjoyed in General Motors. The decision noted other factors which had operated, or might operate, in du Pont's favor as a supplier of General Motors. Upon analysis, however, it must be concluded that the ultimate source of all these avenues of influence is the voting power attached to du Pont's 63,000,000 shares of General Motors. Without that voting power, and without directors on the General Motors Board, du Pont is completely stripped of any potential power to penalize or reward the employees of General Motors in accordance with their demonstrated attitude toward du Pont's products. In the absence of this voting power, lines of communication, suggestions, established relationships and other attributes of ownership of which the Government complained are rendered impotent. These all may represent ways and means by which du Pont's will could be brought to bear on General Motors, but each springs from the voting power attached to the General Motors stock which du Pont owns; absent that voting power, these means are capable of accomplishing nothing.

The Government's principal concern appears to be that du Pont's continuing financial interest in General Motors will

"force [it] to see that General Motors is the prime, if not the exclusive recipient of du Pont's research activities." (Govt. Reply Brief, p. 18) The Government does not suggest that there is any evidence that du Pont has favored General Motors over General Motors' competitors. Such a charge was made in the original complaint but was never proven and at the close of the trial in chief the Government did not even request the Court to make findings of fact that du Pont had so favored General Motors.[16] Needless to say, therefore, such a charge was not before the Supreme Court and played no part in that Court's determination that du Pont's stock interest in General Motors might result in monopolization of General Motors purchases of automotive fabrics and finishes in violation of Section 7 of the Clayton Act. And it is to be noted that in the hearing on relief the Government did not offer any evidence that du Pont had favored, or was favoring, or was likely to favor, General Motors in any way whatsoever. Indeed, in offering its evidence as to the course of trade relations between du Pont and General Motors, counsel for the Government specifically stated:

"Let it again be clearly understood that the Government suggests no improper conduct on the part of the companies by the introduction of this evidence."

The Court recognizes that it is empowered to, and should, in appropriate circumstances, enjoin restrictive conduct even though there is no proof that the parties have actually engaged in that particular type of conduct. International Salt Co. v. United States, 1947, 332 U.S. 392, 400, 68 S.Ct. 12, 92 L.Ed. 20. It is out of deference, therefore, to the Government's naked suggestion that du Pont might favor General Motors rather than on the basis of any proof that du Pont

has favored General Motors, that the Court proposes to include in the final judgment provisions which will specifically prohibit du Pont from entering into preferential arrangements with General Motors and from offering any product or service to General Motors on terms and conditions more favorable than those offered to competitors of General Motors. The Court is of the opinion that such provisions will be adequate to forestall any trade favoritism of the kind which the Government has suggested but not proven.

To order a divestment of du Pont's title, with the resulting tax penalties and market implications which the Court has heretofore described, merely to eliminate the possibility that du Pont might favor General Motors, would in the Court's opinion constitute a serious abuse of discretion. Even if there were proof, either at the trial in chief or at the hearing on relief, that du Pont had followed a course of action of favoring General Motors over the latter's competitors, the Court would be loathe to direct a divestment of legal title until it had at least been demonstrated that injunctive provisions of the kind proposed by the Court would be ineffective. In the absence of any proof of such conduct, and in view of the fact that the Government alleged and failed to prove such conduct, the Court believes that the Government's apprehensions do not constitute an adequate basis for the divestiture order which it proposes.

The takedown plan proposed by amicus Dallstream is ingenious and has merit. If the Court were persuaded that, in order to eliminate the effects offensive to the Clayton Act, it would be necessary to require the distribution of du Pont's legal title to the General Motors shares, the Court would give serious consideration to adopting the takedown plan. The plan, meritorious as it is, introduces com-

16. The passage from the Supreme Court opinion quoted by the Government in its Reply Brief (p. 19) does not indicate any evidence of du Pont favoring General Motors. In stating that du Pont would try to supply General Motors with "the best," the Supreme Court was discussing the point that the trade dealings between du Pont and General Motors had been above-board and that there had been no overreaching of General Motors by du Pont.

plications into du Pont's capital structure. It also operates in different ways, and sometimes in a discriminatory manner, upon various categories of du Pont stockholders. Moreover, its adoption would impose an administrative burden upon this Court for many years to come. In the circumstances, therefore, since the Court has concluded that a distribution of du Pont's legal title to the General Motors shares is not necessary,[17] the Court believes that there is no justification at this time for involving du Pont and its shareholders in the complications of the takedown plan. It may be that the plan will have utility at some time in the future, particularly if a change in administrative or legislative policy were to produce the tax results contemplated by amicus Dallstream in recommending the plan. In such event any party may ask the Court to reexamine the plan in the light of circumstances then existing.

 The Court and the parties are aware of the pendency of bills previously referred to which, presumably, will be considered in the second session of the 86th Congress and which would, if enacted, substantially ameliorate the tax consequences of a distribution of du Pont's legal title to the General Motors shares. It is impossible, however, to foretell whether such legislation will be enacted and, if so, the form it will take. Quite possibly a change in policy on the part of the Internal Revenue Service might also affect the tax consequences of any such distribution. The Court should not be foreclosed from considering such new legislation or rulings nor should the parties be foreclosed from bringing them to the attention of the Court. While a distribution of the legal title to the General Motors shares by du Pont is not, in the opinion of the Court, at all necessary to remedy the effects offensive to the statute in view of the other provisions of the decree to be included, such a distribution would leave a more simplified structure from the corporate standpoint. Consequently, the final judgment should make specific provision for the possibility of such developments and should authorize any party to come before the Court and seek modification of the judgment in the light of any such developments.

### Summary

The Court concludes that it has jurisdiction under Section 15 of the Clayton Act to order appropriate relief in this case not only against du Pont but also against General Motors, Christiana and Delaware; it is without power to order relief directly against the stockholders of Delaware who are also stockholders of du Pont because they are indispensable parties to any such relief and are not before the Court.

The Court has also concluded that under Section 15 of the Clayton Act it is not required to direct divestiture of the ownership of the 63,000,000 shares of General Motors acquired by du Pont in violation of the Clayton Act. Rather the Court has broad discretion under that section to order the relief it deems appropriate to eliminate the effects offensive to the Act and to do so consistent with the protection of the interests of all parties, including the shareholders of these four companies who are innocent of any wrongdoing.

The Government proposal is that the Court should order distribution by du Pont of the 63,000,000 shares of General Motors stock held by it in ten equal annual dividends and that the shares going to Christiana, Delaware and the stockholders of Delaware, a total of about 20,000,000, be delivered to a trustee and sold for their account within twelve months of receipt, about 2,000,000 shares a year. The 63,000,000 shares of General Motors stock have a current market value of over $3,500,000,000, and the 20,000,000

17. In recommending the takedown plan for the Court's consideration amicus Dallstream himself recognized that the plan was not "an essential ingredient in a program of appropriate and equitable relief." Dallstream Report, August 1958, p. 115.

shares a market value of over $1,000,-000,000.

The Internal Revenue Service has ruled that General Motors shares received as dividends by individuals and trusts would be taxed at the market value at the time of receipt as ordinary income, i. e., at rates from 20% to 91% (less dividends received credit). There would also be state income taxes in many cases. The Service has also ruled that the General Motors shares received by non-tax-exempt corporations would be taxed to them at the cost base on the books of du Pont, or at $2.09 per share and that, when sold by or for the account of such corporations, the gains over that base would be taxed at the capital gain rate of 25%. Thus, whatever market value the General Motors shares might have if the Government proposal went into effect, the tax impact on individual stockholders of du Pont would be enormous and the tax impact on corporations forced to sell, such as Christiana and Delaware, would also be great.

The Government decree would also have a serious impact on the market value of the stock of General Motors and of the stock of du Pont. The testimony adduced by the defendants, that of men of wide experience and great responsibility for investing funds and marketing securities, to that effect must be given great weight. The type of evidence introduced by the Government, consisting of data regarding a variety of security. offerings, charts of stock movements and the flow of investment funds, and the testimony of economists without practical experience or management responsibility, cannot overcome the weight of such testimony. On the Government's own evidence, there would be a serious risk that the sales caused directly and indirectly by its proposed decree would depress the market value of the two stocks and cause substantial losses to the many thousands of direct or indirect holders of such stocks who cannot conceivably be called guilty persons or even persons aware of any illegality. The Court will not assume the responsibility of such risk.

Another factor that should be given some consideration is that the Government plan would seriously handicap General Motors from doing any common stock financing during the period of the plan, to its possible detriment and the injury of its stockholders.

The Court has concluded that the Government proposal is unnecessarily harsh and punitive and that there is an effective means of preventing any possible control of General Motors through use of the votes on the General Motors shares now held by du Pont either by du Pont or by persons whom the Government has any reasonable basis for claiming that they might act in concert. The effective means is to divest du Pont of the votes on such General Motors shares and pass such votes through pro rata to du Pont stockholders, and then to enjoin the exercise of such votes as lodge in Christiana and Delaware and in officers and directors of du Pont, Christiana and Delaware, their spouses and dependents. By this means at least as many votes by persons claimed by the Government to belong to a group will be taken from them as would be the case if the Government's proposed decree were put into effect. A decree to this effect will make it unnecessary for the Court to make a determination whether any of the groups of persons whom the Government claims would act in concert would do so or whether, if they did act in concert, they would have a sufficient number of votes to control or influence General Motors.

The Court is of the opinion that there is nothing in the record which would support even by inference the conclusion that du Pont's possession of the bare legal title to General Motors stock, stripped of its right to vote and of its right to representation on the Board of General Motors, would create any possibility that the stock would have any influence on the practices and policies of General Motors or could be used in any way that would be inconsistent with the mandate of the Supreme Court.

**52**

The essential features of the final judgment which the Court has decided upon have been indicated in some detail in the foregoing discussions. Without intending to limit or modify in any way the matters which the Court has heretofore discussed, the basic features of the final judgment which the Court proposes to enter are:

1. Du Pont will be divested of the right to vote any of the 63,000,000 shares of General Motors stock which it owns and such shares will be voted hereafter by the stockholders of du Pont with the exceptions noted below.

2. Injunctive provisions will prohibit du Pont, Christiana and Delaware from acquiring any additional stock interest in General Motors and from attempting to influence General Motors in any way.

3. Christiana and Delaware will be prohibited from voting any of the 63,-000,000 shares of General Motors that would otherwise be voted by them as stockholders of du Pont and the portion of such shares that are allocable to Christiana and Delaware will be sterilized along with the 535,500 shares of General Motors which Christiana presently owns.

4. No officer or director of du Pont, Christiana or Delaware will be permitted to vote any General Motors stock, either in accordance with the pass-through described above or otherwise.

5. No officer or director of du Pont, Christiana and Delaware will be permitted to serve as an officer or director of General Motors, and General Motors will be prohibited from having as an employee any employee of du Pont, Christiana or Delaware.

6. All preferential trade arrangements or understandings between du Pont and General Motors will be canceled, and they will be prohibited from entering into any such arrangements or embarking on joint commercial ventures so long as du Pont owns General Motors stock. Any existing requirements contracts between the two companies will be canceled and they will not be permitted to enter into any such contract for a period of three years following entry of the final judgment herein, after which period requirements contracts of not more than one year's duration will not be prohibited.

7. Provision will be made for a review and reconsideration of the terms of the final judgment in the event the provisions thereof should prove in the future to be inadequate to curb the violation, and in the event of an administrative or legislative change in tax policy which would significantly alter the tax consequences of a distribution of the General Motors stock owned by du Pont.

8. Appropriate provisions will be included for retention of jurisdiction by the Court and for enforcement of the terms of the judgment.

The above and foregoing opinion of the Court constitutes the Findings of Fact and Conclusions of Law.